**Margaret ROOKARD, Plaintiff-Appellant,**

v.

**HEALTH AND HOSPITALS CORPORATION, Defendant-Appellee.**

No. 762, Docket 82–7739.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1983.

Decided June 9, 1983.

---

Ernest L. Mathews, Jr., New York City (Daniel Elliot Laitman, P.C., New York City, of counsel), for plaintiff-appellant.

Marvin R. Kwartler, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, Stephen J. McGrath, Gary P. Shaffer and Leslie C. Kamelhar, New York City, of counsel), for defendant-appellee.

Before LUMBARD, VAN GRAAFEILAND and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

Margaret Rookard, formerly the Director of Nursing at Harlem Hospital, appeals from the June 21, 1982 decision of Judge Gagliardi of the Southern District of New York, dismissing her civil rights action against the New York City Health and Hospitals Corporation (HHC), the municipal corporation which operates New York City's municipal hospitals. Rookard claims that HHC, in violation of her First Amendment right to free speech, demoted and eventually fired her because she disclosed illegal and wasteful practices at Harlem Hospital. Judge Gagliardi dismissed Rookard's claim after a two-day bench trial, concluding that Rookard had not, as required by *Monell v. Department of Social Servs.*, 436 U.S. 658,

98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), proven that an official HHC policy caused her demotion or discharge. The central issue on appeal is the sufficiency of Rookard's proof under *Monell.* We disagree with Judge Gagliardi. Rookard presented sufficient evidence that her injuries resulted from an HHC policy to chill the exercise of First Amendment rights by punishing those who dare complain of corruption and mismanagement. Accordingly, we reverse the judgment and remand for further proceedings.

Rookard's evidence consisted of her own testimony and numerous exhibits.[1] At the close of Rookard's case, HHC rested, and presented no evidence. The facts, as testified to by Rookard, and supported by her documentary evidence, may be summarized as follows.

In October, 1980 Rookard began employment, at a salary of $42,000, as Harlem Hospital's Director of Nursing. In this position Rookard supervised a staff of approximately 1,000 persons, including 600 registered and practical nurses. Rookard was hired by Anthony Summers, the hospital's Acting Executive Director. Shortly after Rookard began work Summers asked her to sign permits that would authorize unlicensed nurses employed by outside commercial agencies to work at Harlem Hospital. Rookard believed that such permits could lawfully be issued only to nurses directly employed by the hospital, and she refused to sign. Summers resented Rookard's decision and thereafter ostracized her. Rookard noted a number of other irregularities in the hospital's nursing department. She found that many nurses abused the hospital's "sign-in" procedures, and either failed to sign the register, or signed for hours they had not worked; that the hospital had not kept adequate records of its use of licensed agency nurses, and could not accurately evaluate bills submitted by agencies; that nurses who worked overlapping, consecutive shifts, one shift each for the hospital and an agency, frequently were paid by

---

1. Rookard also presented two witnesses who testified only to her professional qualifications.

both employers for the time of overlap; that Harlem Hospital, for no apparent reason, hired most of its agency nurses through a single agency (Gotham Registry); that agency nurses hired to work in specialized areas often lacked proper credentials; and that some of the foreign nurses working at the hospital had not adequately documented their immigration status. Rookard reported all of these problems to Summers, who ignored her. She took steps to eliminate the problems, and to improve efficiency, and thereby earned the enmity of a number of her nurses. She began to receive anonymous, threatening phone calls and letters.

Illness kept Rookard out of her office from February to May, 1981. During Rookard's absence one of her subordinates, at Summers' direction, signed the permits authorizing unlicensed agency nurses to work at the hospital. Rookard, upon returning to work, refused to use the permits. She returned the permits to the State Education Department and advised the Department that they had been invalidly issued. Summers resigned his post as Harlem Hospital's Acting Executive Director in May, 1981, and was succeeded by Carl Carter as Executive Director. In July, 1981 Rookard told Carter that she planned to inform HHC's Inspector General's Office of the threats against her and of some of the problems she had found. Carter said "fine," and did not object. Later that month Rookard met with HHC Inspector General Conrad Johns and told him of the threats, the dispute over unlicensed agency nurses, and the fact that nurses sometimes left work before completing their shifts. Johns, or his staff, promised an investigation.

In early August, Carter met Rookard at HHC headquarters in Manhattan and told Rookard of his decision to relieve her as Director of Nursing, and to transfer her to headquarters as an assistant to Grace Matsunaga, the Director of Nursing, Corporate Office. Carter told Rookard that she had been "battered enough" at Harlem Hospital, and that she would be reinstated as Director of Nursing when matters "cooled down," but gave no other reason for the transfer. Rookard objected to the transfer,

but began work in her new position, at her previous salary, late in August. Matsunaga assigned Rookard a windowless cloak room for an office and informed her of her displeasure that Rookard's salary was higher than hers. Rookard worked on "special projects" for Matsunaga into early 1982.

On January 28, 1982 HHC's Inspector General's Office reported on the investigation of Harlem Hospital it had conducted following Rookard's transfer. The Inspector General's report stated that Gotham Registry had overcharged Harlem Hospital $513,636.18 between September, 1977 and May, 1981. Harlem Hospital, the report found, had repeatedly paid Gotham for full working shifts when Gotham's nurses actually worked only part shifts. Although Rookard had, by January, 1981, reduced the number of tours serviced by Gotham nurses by 43%, the hospital's use of Gotham nurses returned to previous levels when, in March, 1981, illness kept Rookard away from work. The report also found that Summers' plan to use unlicensed agency nurses "was clearly in violation of state rules and regulations."

On March 9, 1982 Carlotta Brantley, HHC's Vice President for Corporate Affairs, informed Rookard that Matsunaga no longer would tolerate an assistant earning more than she earned, that budget cuts necessitated personnel changes within HHC, and that she, Rookard, would have to find a new position. Brantley offered to employ Rookard as an entry-level nurse, an offer which Rookard indignantly refused. By letter dated March 19, 1982 Brantley gave Rookard notice of discharge, effective April 30, 1982.

Rookard retained counsel, who requested HHC's General Counsel to stay the scheduled discharge. On April 28th the General Counsel informed Rookard's attorney that a stay would not be granted. On April 29th Rookard filed suit in the Southern District for an injunction against discharge. Judge Gagliardi denied the injunction; Rookard was discharged; and Rookard's claim against HHC for reinstatement as Director

of Nursing and damages was tried on May 17th and 18th.[2]

Under *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a plaintiff suing a municipal corporation, such as HHC, under 42 U.S.C. § 1983 must prove that the constitutional wrong complained of resulted from the corporation's official policy, custom, ordinance, regulation, or decision. As a municipal corporation cannot be held liable under § 1983 on a *respondeat superior* theory, *Monell*, 436 U.S. at 691–94, 98 S.Ct. at 2036–37, proof that the corporation employed a tortfeasor will not, standing alone, establish liability. *Monell* thus required Rookard to show that an official HHC policy of punishing "whistle-blowers," in violation of her First Amendment right to free speech, caused her transfer and discharge. The district judge ruled Rookard's evidence insufficient to establish the existence of any relevant HHC policy, and so dismissed the case. We disagree with the judge's ruling and find, as a matter of law, that Rookard's proof was sufficient.

A single unlawful discharge, if ordered by a person "whose edicts or acts may fairly be said to represent official policy," *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, may support an action against the municipal corporation. The difficulty, of course, lies in identifying those officials whose actions, because they may fairly be treated as the municipality's own actions, establish policy. Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.[3] *See Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir.1982).

An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions. *See Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980). An allegation of policy-making authority thus requires proof of the official's scope of employment and his role within the municipal or corporate organization.[4] An official's title, though not dispositive of his authority to make policy, *see Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir.1980), is relevant for the inferences fairly to be drawn therefrom.

Having evaluated Rookard's evidence under the principles above, we conclude that Rookard sufficiently established both Carter's and Brantley's authority to make policy. Rookard proved that Carter held the post of Executive Director of Harlem Hospital; that Rookard herself, as Director of Nursing, held a high position and supervised approximately 1,000 employees; that Carter ordered her transfer; and that the transfer occurred. This evidence establishes that Carter held a top level position with HHC and had authority to order the transfer. Rookard similarly proved that Brantley held the post of Vice President for Corporate Affairs and had authority to order her discharge. Equally important, there was evidence that Carter's and Brantley's authority over personnel decisions was final. On August 7, 1981, several days after Carter transferred Rookard, HHC President Stanley Brezenoff received an anonymous telegram warning him that the "Establishment" wanted to "remove" Rookard because "she exposed frauds." Brezenoff referred this telegram to Carter. In April,

---

**2.** Rookard's complaint named both HHC and the City of New York as defendants. All claims against the City of New York were dismissed by consent of the parties at the close of trial.

**3.** The issue raised by *Monell* is not whether a particular official generally may be characterized as a policy-maker, but whether that official's particular decision established a policy fairly attributable to the municipality. Thus municipal liability may be predicated upon the unconstitutional acts of a subordinate official who has

been delegated final authority in limited areas. *See generally,* Schnapper, Civil Rights Litigation After Monell, 79 *Colum.L.Rev. 213, 219–24 (1979).*

**4.** Mayors may be treated as policy-makers without proof of their specific powers and responsibilities. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 448 (2d Cir. 1980). Lesser officials, however, cannot similarly be presumed to embody plenary municipal power.

1982, when Rookard's counsel requested a stay of the scheduled discharge, HHC's General Counsel declined to grant a stay or to reverse the transfer. The reluctance of HHC's President and General Counsel to intervene, or even to inquire into Rookard's claims, confirms that Carter and Brantley had final authority in personnel matters.[5] Moreover, HHC's counsel conceded at trial that HHC is "highly decentralized." We think that this evidence, in the absence of rebuttal evidence from HHC, sufficiently established Carter's and Brantley's policy-making authority. We accordingly hold, on the present record, that if Carter transferred Rookard, and Brantley fired her, because she brought evidence of malfeasance and corruption to HHC's Inspector General, they established HHC policy.

Of course, to prevail, Rookard must prove more than the existence of an official policy. Under *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), she also must prove that her speech (1) was constitutionally protected and (2) was a "substantial factor" in the action taken against her. Because the district judge dismissed under *Monell,* he did not consider the sufficiency of Rookard's evidence under *Mt. Healthy.*

█ The First Amendment protects a government employee from discharge for speech upon matters of public concern, *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), unless, under all the circumstances, the employee's interest in free comment is outweighed by the State's interest in the efficiency of its public services. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In striking the balance between these interests, a court should consider whether the speech impaired the

employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency. *See Pickering,* 391 U.S. at 569–70 & 572–73, 88 S.Ct. at 1735 & 1736–37. Tested under these principles, Rookard's complaint to HHC's Inspector General clearly is constitutionally protected. An allegation of corrupt and wasteful practices at a large municipal hospital, made to the city official empowered to investigate such charges, obviously involves a matter of public concern. The matters of which Rookard complained were her proper concern; as Director of Nursing, it was her duty to do as she did. There is no suggestion that Rookard's speech impaired her ability to perform her job, or impeded the regular operation of Harlem Hospital. Rookard attempted to minimize the disruption of working relationships by giving Carter advance notice of her intention to speak to the Inspector General. That Rookard's speech was made privately, rather than publicly, did not remove it from First Amendment protection. *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

█ Rookard also has shown that her complaint was a substantial factor behind the transfer. Without having previously expressed discontent with Rookard's work, Carter ordered the transfer shortly after Rookard spoke to the Inspector General. Carter gave no reason for the transfer except to remark that Rookard had been "battered enough." The record contains no evidence that the transfer was for cause. In light of Rookard's long and distinguished career as a nursing administrator, and her previous successful service as Director of Nursing at a different HHC hospital, her

---

5. The President's and General Counsel's failure to intervene is relevant not as a ratification of the transfer and discharge, but as indirect evidence of the scope of Carter's and Brantley's authority. If Carter and Brantley had not had final authority, Rookard's high position, combined with the Inspector General's report finding merit in her allegations about Harlem Hos-

pital, could reasonably have been expected to prompt an investigation of the claim of retaliatory discharge. This is not a case where a high official notified of a pending discharge claimed to be unlawful could reasonably decline to investigate because of the claim's apparent lack of merit.

treatment can only be explained as retaliation.[6]

■ Brantley was responsible for Rookard's discharge on April 30, 1982. As Vice President for Corporate Affairs she must have known of the Inspector General's report resulting from Rookard's transfer and Rookard's earlier treatment by Carter. The conclusion is inescapable that Brantley's shabby treatment of Rookard and the discharge were both intended to make it clear to HHC personnel that blowing the whistle would not be tolerated and would be met with swift retribution.

We thus conclude that Rookard met all the requirements of *Monell* and *Mt. Healthy.* The district judge should not have granted judgment to HHC, and a remand is necessary. We do not, of course, hold that Rookard has conclusively established a case against HHC. Upon remand, both parties will be free to present evidence regarding the points discussed above and the issues not reached because of the dismissal following the plaintiff's case.[7]

Reversed and remanded for proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring:

Although, had I been in Judge Gagliardi's shoes, I probably would have done exactly as he did, I concur in my colleagues' decision to vote for reversal. In voting to decide this very close question in appellant's favor, I am influenced somewhat by (1) testimony that appellant was treated most unfairly, (2) evidence of corruption and misfeasance in a publicly funded and supervised institution, and (3) the inadequacy of appellant's legal representation in the district court. I want to make clear, however, that, although I concur in the decision to reverse, I disagree with the majority's holding that appellant proved as a matter of law the existence of an official HHC policy of punishing "whistle-blowers".

Appellee is a public benefit corporation created by Chapter 1016 of the Laws of 1969. N.Y.Unconsol. Laws §§ 7381–7406 (McKinney 1979). It is administered by a sixteen member board of directors consisting of New York City's Administrator of Health Services, Chief Administrative Officer of Health Functions, Director of Community Mental Health Services, Administrator of Human Resources, and Deputy Mayor-City Administrator, together with the Chief Executive Officer of the Corporation, and ten mayoral appointees, five of whom are designated by the City Council. § 7384.

Appellant's action against the corporation was commenced on April 29, 1982. An amended complaint was served on May 12,

6. The controversy that Rookard's allegations created at Harlem Hospital may explain Carter's decision to order the transfer. Apparently, many hospital employees and community members supported Rookard's efforts at reform. As noted, on August 7, 1981 anonymous persons who signed themselves as "Concerned employees of Harlem Hospital," sent HHC President Brezenoff a telegram stating that Rookard's success in "expos[ing] frauds" had turned the "Establishment" against her. Six days later, on August 13, 1981, anonymous persons who signed themselves as "The Harlem Community and the Concerned Staff of Harlem Hospital Center," sent Mayor Koch a telegram stating that Harlem Hospital was "in crisis" because Carter was "unqualified" and because Rookard, "a brave and honest woman," had been removed from her job. The Mayor's Office referred this second telegram to HHC Inspector General Johns. In late August, Carter told an investigator from the Inspector General's Office that Rookard's allegations were false and that she would retract them in a letter to the "Black Voice." Carter thus was aware in late August, and presumably was aware before the transfer, of community support for Rookard.

7. Of course, upon remand, HHC will be entitled to reopen its case and to present evidence. The course of proceedings at trial compels this result. After Rookard rested, HHC moved to dismiss under *Monell.* The district judge clearly stated his belief that Rookard's proof was insufficient under *Monell,* and did so in words that left no doubt that dismissal would follow. The district judge then asked HHC's attorney if he rested his case, and the attorney replied that he did rest. HHC's answer alleged that Rookard would have been fired without regard to her speech, and simple fairness requires that HHC be allowed to present evidence on that defense and on other relevant points.

1982, and the case went to trial on May 17, 1982, one day before appellee's answer was filed. Much of the 17-day interval between the bringing of the suit and the start of trial was devoted to the taking of depositions, transcripts of which apparently had not been completed and exchanged when the case went to trial. No deposition was offered in evidence by appellant's attorney. At the close of plaintiff's case, the district court asked in obvious surprise:

You have no further witnesses? Have you had a chance to read and digest the *Monell* case? I suggest you go to the library either right now or sometime this afternoon and read it.

I will adjourn this case until tomorrow morning at 10:00.

This was a red-flag warning to appellant's counsel that the district court was not satisfied with the proof he had offered. Nonetheless, counsel rested. It is not at all surprising that the district court thereafter granted appellee's motion to dismiss.

Appellant's skimpy proof showed that on August 7, 1981, Stanley Brezenoff, appellee's president, received an anonymous telegram informing him of Harlem Hospital frauds uncovered by appellant and her fear of removal by the "establishment". Mr. Brezenoff immediately filed a "Confidential Committee Report" with appellee's "Office of the Inspector General" requesting "any and all information regarding the aforementioned disclosures." A five-month investigation followed, evidenced by 160 pages of reports. These undisputed facts hardly are indicative of a corporate policy to punish whistle-blowers. Indeed, the very existence of the Office of the Inspector General is indicative of a contrary intent.

The reports from the Inspector General's office disclosed, among other things, that Carl Carter, whom my colleagues find to be a policy-making official, was not even aware of the fact that he had to put appellant's relief from duty in writing until a confidential investigator told him to do so. Reporting further on his investigation of Carter, the confidential investigator stated:

The C.I. asked Mr. Carter about the allegations of misconduct mentioned in the complaint. He stated that none of the allegations were [sic] true and that Ms. Rookard is supposed to write a letter to the "Black Voice" saying that they are not true.

Mr. Carter was asked how Ms. Rookard was dismissed from Harlem Hospital. He stated that Ms. Rookard and himself mutually agreed that she would be relieved of her duties. He continued that Ms. Rookard was unable to get across to Staff. Several times she has been threatened. A nurse actually slapped her according to Carter.

He informed the C.I. that a letter is in her personnel folder indicating that she was reassigned.

These, I suggest, do not read like reports of interviews with a policy-making corporate official.

The report of the investigator's conversation with appellant reads in part as follows:

She also stated that while she was employed at Harlem Hospital, she was threatened many times with physical harm. The threats began after she was there for a month. According to Ms. Rookard the staff (nursing) was not accountable to anyone for anything and there was a lack of performance.

\* \* \* \* \* \*

She further stated that each time an administrator is removed by a particular faction of individuals it adds fuel to their fire and makes it impossible for a good administrator to survive at Harlem Hospital.

I find it difficult to equate the phrase "a particular faction of individuals" with the officials and administrators who made corporate policy for the association. In sum, I do not agree with the majority that "Rookard presented sufficient evidence that her injuries resulted from an HHC policy to chill the exercise of First Amendment rights by punishing those who dare complain of corruption and mismanagement."

One thing is clear, however, and that is that conditions at Harlem Hospital were chaotic and had been so since appellee as-

sumed jurisdiction over it. In the eleven year period between 1970 and 1981, appellee had five different presidents, and Harlem Hospital had at least eleven Executive Directors. Dr. Summers was replaced after it was learned that he had used $2,000 of Harlem Hospital money to provide a summer job for his son at another hospital. This, however, was only the tip of the iceberg. As Judge Lumbard has pointed out, the Hospital had been bilked of funds in excess of one half million dollars. This was wrongdoing which could exist only if public disclosure was suppressed. If this condition was caused by a lack of supervision or training so severe as to amount to deliberate indifference or gross negligence on the part of top echelon corporate officials, resulting in a deprivation of appellant's constitutional right to speak out for what was right, section 1983 liability may be found to exist. *Doe v. New York City Dep't of Soc. Serv.,* 649 F.2d 134, 141–47 (2d Cir.1981); *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

I concur in the order to reverse because, examining appellant's evidence with the aid of a powerful magnifying glass, I am able to make out the barest glimmer of a prima facie case on the above-described grounds.