**Kenneth JORDAN, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. 03 Civ. 4110(SAS).**

United States District Court,
S.D. New York.

Aug. 22, 2003.

Peter G. Eikenberry, New York City, for Plaintiff.

Joseph C. O'Keefe, Steven Yarusinsky, Proskauer Rose LLP, Newark, NJ, for Defendant.

## AMENDED OPINION AND ORDER

SCHEINDLIN, District Judge.

On September 27, 2002, Metropolitan Life Insurance Company ("MetLife") terminated Kenneth Jordan and subsequently filed a termination report with the National Association of Securities Dealers ("NASD"). The report, referred to as a Uniform Termination Notice for Securities Industry Registration ("Form U–5"), states that Jordan was terminated due to his unethical conduct.

Jordan brings this action against MetLife seeking damages for: (1) defamation; (2) violation of the New Jersey "Whistle Blower Statute"; (3) age discrimination; and (4) retaliation.[1] He now moves for a preliminary injunction ordering MetLife to amend the Form U–5 and enjoining MetLife from making defamatory statements to his clients. For the reasons stated below, Jordan's motion is denied.

## I. BACKGROUND

### A. Jordan's Employment History

In December 1982, Jordan began working for MetLife as a Financial Services Representative ("FSR") at the Jersey Shore Financial Group ("Jersey Shore Group") located in Tinton Falls, New Jersey. Complaint ("Compl.") ¶ 5. An FSR is responsible for finding prospective clients, learning about their family situation, objectives and financial needs, and assisting them in planning their financial futures. In the course of the relationship, the FSR advises the clients on various types of life insurance, annuities, or mutual funds and sells them the most beneficial financial instruments. Id. ¶ 6.

During Jordan's twenty-year employment with MetLife, he developed a personal client base of over 1,000 clients. See Jordan's Memorandum in Support of Motion for Preliminary Injunction ("Pl. Mem.") at 5–7. In addition, he was nationally honored by MetLife for fifteen years, both for his productivity and his continued compliance with MetLife's ethical standards. Compl. ¶ 12.

In the spring of 2002, Jordan contacted MetLife's Regional Vice President, David Mancini, and requested a transfer out of the Jersey Shore Group because its management was committing, encouraging and allowing unethical and possibly illegal

1. The Court's subject matter jurisdiction is based on diversity of citizenship as Jordan is a citizen New Jersey and MetLife is a citizen of New York, and on federal question as Jordan is suing MetLife under the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964.

practices.[2] *Id.* ¶¶ 19–21. The alleged practices included forging signatures on policies and writing new policies for existing clients, which inappropriately generated new and substantial commissions for MetLife management to the detriment of the clients.[3] *Id.*

On September 27, 2002, a few months after Jordan alerted senior management to the unethical practices of the Jersey Shore Group, he was terminated. Jordan's supervisors—Chris Riddle, Managing Director, and Frank Dunn, Agency Director—claim that during the summer of 2002, they received customer complaints about Jordan's sales. Jordan allegedly engaged in the prohibited practice of replacement and "financing." [4] *See* Def. Mem. at 4.

### B. The NASD Form U–5

In order to sell variable life insurance, annuities and mutual funds, a dealer must be registered with the NASD. When a company such as MetLife, which is regulated by the NASD, terminates an NASD registered employee (*e.g.,* Jordan), the company must file a Form U–5 with the NASD. *See* Pl. Mem. at 8. On October 2, 2002, MetLife filed a Form U–5 for Jordan in New York City, which accused Jordan of "misrepresentation of client policy values and policy options." *Id.* The next day,

the NASD began an inquiry into MetLife's allegations and requested Jordan's response to the allegations, and on March 14, 2003, the NASD closed the inquiry without taking any action against Jordan. *See id.* at 10.

As a result of the Form U–5, Jordan claims that he has been "effectively blackballed" from the industry. *Id.* at 13. Jordan attempted to obtain employment with John Hancock Life and was told that the Form U–5 "make[s] it impossible for John Hancock or any like quality carrier to offer [Jordan] employment until the Metropolitan U–5 is amended." 4/15/03 Letter from Richard Davis, Associate General Agent of John Hancock, to Jordan ("Hancock Ltr."), Ex. 9 to Compl. In addition, Jordan claims that MetLife representatives have called many of his clients and "intentionally made false statements to these clients impugning [his] ethics, honesty and business practices." Pl. Mem. at 11.

### C. Procedural History

On June 4, 2003, Jordan filed this action. On the same day, Jordan also submitted the underlying dispute regarding the Form U–5 to arbitration, pursuant to the NASD Code of Arbitration Procedure. *See* Tr. at 8. Jordan seeks a preliminary injunction from this Court, pending the arbitration.[5]

---

**2.** Although Mancini admits that Jordan requested a transfer, he denies that Jordan informed him of any unethical conduct in the Jersey Shore Group. *See* 7/11/03 Transcript of Preliminary Injunction Hearing ("Tr.") at 152–54.

**3.** This practice, called "replacement," involves "replacement of an existing life insurance policy with a new life insurance policy. In some circumstances, this is accomplished by utilizing accumulated cash value from the pre-existing policy. In others, a new policy is purchased and the old one is permitted to

lapse." MetLife's Memorandum in Opposition to Motion to Dismiss ("Def.Mem.") at 4.

**4.** "Financing involves accessing cash values or dividends built up in life insurance policies, or other financial products, through loans and other mechanisms to fund premium payments on a new life insurance product." Def. Mem. at 4.

**5.** Pursuant to Section 10335 of the NASD Code of Arbitration Procedure:

> In industry ... disputes required to be submitted to arbitration pursuant to Rule 10201, parties may seek a temporary in-

On June 10, Judge Victor Marrero of this Court issued an Order to Show Cause why an order should not be entered directing MetLife to amend the Form U–5 against Jordan and enjoining MetLife from making false, disparaging and defamatory statements and writings to Jordan's clients. On July 7 and 11, this Court held a preliminary injunction hearing, during which Jordan and MetLife called witnesses and presented documentary evidence.

## II. LEGAL STANDARD

Although the decision whether to grant a preliminary injunction lies squarely within the court's discretion, "a preliminary injunction is an extraordinary measure that should not be routinely granted." *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F.Supp.2d 586, 597 (S.D.N.Y.2001) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). In order to obtain a preliminary injunction, a plaintiff must ordinarily demonstrate: (1) the possibility of irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party. *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 24 (2d Cir. 2000). "Irreparable harm is injury for which a monetary award cannot be adequate compensation." *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir.1996).

A heightened standard applies where the injunction which plaintiff seeks is mandatory in nature. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). A mandatory injunction is one which would "alter the status quo by commanding some positive act." *Id.* A court should only issue a mandatory injunction if the party seeking the injunction shows "a clear or substantial likelihood of success on the merits." *McKenna v. Wright*, No. 01 Civ. 6571, 2002 WL 338375, at *4 (S.D.N.Y. Mar. 4, 2002) (citing *Jolly v. Coughlin*, 76 F.3d 468, 473–74 (2d Cir.1996) and *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir.1990)).

## III. MANDATORY INJUNCTION: AMENDING THE FORM U–5

### A. Irreparable Harm

Jordan contends that the Form U–5 will cause him irreparable harm by damaging his business reputation, employment opportunities with comparable insurance companies, and client base. *See* Pl. Mem. at 12–13. There is no doubt that the negative Form U–5 will substantially damage Jordan's reputation in the insurance industry.[6] As a result, Jordan, who is now deemed an unethical agent, will have difficulties attracting prospective employers and clients and maintaining his client base.[7]

The disputed Form U–5 effectively prevents Jordan from providing any of his clients with the NASD regulated financial

---

junction order ... from a court of competent jurisdiction.

**6.** A negative Form U–5 "can effectively 'blackball' a [dealer] from the industry." *Acciardo v. Millennium Sec. Corp.*, 83 F.Supp.2d 413, 419 (S.D.N.Y.2000); *see also Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1164 (7th Cir.1998) ("Any embellishment or exaggeration [in a Form U–5] can only damage the

agent's professional reputation and make the job hunt more difficult.").

**7.** Pursuant to MetLife's policy, Jordan may solicit the clients that he developed at Met-Life. However, without being employed by a major insurance company, he has little to offer his former clients. *See* Tr. at 8.

instruments,[8] which comprised 85% of his business, because he is unlikely to find work with a registered dealer. Consequently, if Jordan's clients want to continue using him as their insurance agent or refer him to others, he will not be able to provide full service. He will inevitably lose clients to other agents who can provide full service. Indeed, if an extended period of time passes before the arbitration panel renders its decision, Jordan may lose the majority of the 1000 clients he has developed over two decades. It is unlikely that many of these clients will return to Jordan if and when he again obtains employment with a registered dealer thereby enabling him to sell NASD regulated financial instruments.

■ There is no adequate remedy at law for Jordan's damages if MetLife *mistakenly* filed a false Form U–5. The disputed Form U–5 is subject to qualified immunity and Jordan will receive compensation for his damages only if he can establish that MetLife acted with actual malice when making the statement. *See Fahnestock & Co. v. Waltman*, 935 F.2d 512, 516 (2d Cir.1991); *Acciardo*, 83 F.Supp.2d at 419. Thus, even if Jordan prevails before the arbitration panel, he is unlikely to receive compensation from MetLife for the loss of his client base. In sum, Jordan will suffer irreparable harm,[9] especially if there is any delay in the arbitration proceeding.[10] *See, e.g., Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir.1999) (finding irreparable harm because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"); *Towers Fin. Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 822–23 (S.D.N.Y.1992) (finding irreparable harm where "[plaintiff's] reputation among customers and potential customers will be severely damaged ... [and the injury] is both imminent and 'incapable of being fully remedied by monetary damages'") (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990)).[11]

### B. Success on the Merits

■ Although Jordan has shown irreparable harm, he cannot compel MetLife to amend the disputed Form U–5 because he has not shown a clear or substantial likelihood of success on the merits. Jordan contends that he complied with MetLife's

---

8. The NASD regulated financial instruments are annuities, mutual funds, and variable life insurance products.

9. Generally, damage to a discharged employee's reputation and decreased employment opportunities are not considered irreparable harm because the plaintiff has a remedy at law and can be compensated with money damages. *See Stewart v. I.N.S.*, 762 F.2d 193, 200 (2d Cir.1985). However, as discussed above, there is a possibility that Jordan will receive no compensation even if the Form U–5 is false.

10. MetLife contends that Jordan has not shown irreparable harm because he did not bring this action until June 2003, which was over seven months after he knew of the filing

of the Form U–5. *See* Def. Mem. at 14. However, it was reasonable for Jordan to wait until after the NASD concluded its investigation in March 2003.

11. Today's holding does not imply that all negative Form U–5s will result in irreparable harm to terminated employees. Irreparable harm depends on the nature of the plaintiff's injury. A plaintiff who shows harm to a client base developed over twenty years establishes irreparable harm, as opposed to a plaintiff showing mere delay in obtaining a new job. The latter is compensable monetarily and therefore does not warrant equitable relief. In contrast, there is no adequate remedy at law for loss of a client base, a loss which cannot be remedied by money damages. *See Ticor Title Ins.*, 173 F.3d at 69.

ethical standards and that he was terminated in retaliation for alerting management of the unethical conduct of other employees. However, there is substantial evidence supporting MetLife's claim that Jordan was terminated for his own unethical activity. Furthermore, the NASD's decision not to take action against Jordan has no bearing on his likelihood of success on the merits.

### 1. Jordan's History of Non–Compliance

Jordan has an extensive and documented history of non-compliance with MetLife's ethical standards. MetLife confronted Jordan about these issues throughout his employment. As early as 1996, MetLife was aware of Jordan having compliance issues. *See* 7/7/03 Transcript of Preliminary Injunction Hearing ("Tr.") at 90 (Testimony of Chris Riddle). In 1999, the compliance issues persisted, and Riddle met with Jordan on several more occasions. These meetings specifically addressed Jordan's conduct concerning "the movement of funds, complaints, misunderstandings and replacement issues." 1/13/99 Letter from Riddle to Vince Vitiello, Zone Vice President, Defendant's Exhibit ("Def.Ex.") A, at 1. MetLife implemented a corrective action plan with Jordan and he signed an agreement confirming that he would cooperate to resolve the compliance problems or face "serious consequences." *Id.* at 2. In 2000, Riddle met with Jordan again regarding compliance procedures. *See* July 2000 Letter from Riddle to Jordan, Def. Ex. B, at 2; Tr. at 96 (Riddle). In a letter written in July 2000, Riddle referred to the 1999 corrective action plan, and stated that "for [Jordan] to continue [his] career with MetLife an immediate and complete reversal is needed on compliance issues based on [his] past performance." *Id.* Jordan signed the letter, stating "I understand this is my *final* warning to rectify the above concerns and to follow all rules/regulations in the future." *Id.* at 2 (emphasis added).[12]

In 2002, MetLife became aware of several questionable sales by Jordan. *See* Def. Mem. at 5; 7/10/02 Letter from Dunn and Riddle to Pamela Prohanic, Supervisor of Ethics and Compliance, Def. Ex. C. In particular, Jordan allegedly advised one client to replace an existing policy by purchasing a policy of a smaller value. *See* Def. Mem. at 7. Defendant argues that Jordan's advice was motivated by the substantial commissions he received as a result of the sales rather than by the client's financial needs. *See id.* at 8. Defendant contends that Jordan did not disclose various options to the client and misrepresented the transaction. *See id.* at 7–8. Although Jordan claims that proper disclosure was made and that his manager approved the transaction, *see* 8/2/00 Managers Report on Replacement, Plaintiff's Exhibit ("Pl.Ex.") 30, Jordan has not shown that his version is substantially likely to prevail at trial.

### 2. The NASD's Inaction

Contrary to Jordan's argument, the NASD's decision to close its investigation of his activities without any action against

---

12. Jordan notes that throughout his employment he passed MetLife's annual compliance reviews and received awards for his high productivity and ethical compliance. *See* Pl. Mem. at 5. However, Riddle and Mancini testified that each year the compliance reviews were done during a month when Jordan did not have any compliance problems. *See* Tr. at 91 (Riddle), 169 (Testimony of David Mancini). Therefore, any compliance issues that arose outside the period of the review would not have prevented Jordan from receiving performance awards.

him does not indicate that the Form U–5 is false. *See* Pl. Mem. at 14–15. More importantly, the decision is not entitled ·to any weight in these proceedings. Indeed, the letter that the NASD sent to Jordan informing him of the close of the investigation states:

> It is our view that determination by NASD not to take action against an NASD member or a member's associated person *has no evidentiary weight* in any mediation, arbitration or judicial proceeding. Further, we consider it inconsistent with just and equitable principle of trade for an NASD member or a member's associated person *to attempt to introduce* such a determination into evidence in any of these forums.

3/14/03 Letter from Robert J. McCarthy, NASD Staff Supervisor, to Jordan, Ex. 8 to Compl. (emphasis added). In sum, MetLife's stated reason for terminating Jordan is not clearly pretextual. MetLife has submitted evidence that Jordan has had compliance problems pending for years that could lead to his termination if not rectified. As a result, Jordan has not shown a clear likelihood of success on the merits.

### C. Expedited Arbitration Hearing

 A preliminary injunction cannot be issued because Jordan does not satisfy the heightened standard for a mandatory injunction. In addition, this Court cannot order that an amended U–5 be filed, because there has been no determination of the merits of the dispute. However, if Jordan loses his clients pending a lengthy arbitration proceeding, which may easily last a year, his client base will be depleted and unrecoverable. An expedited arbitration proceeding is the only option that provides Jordan with any adequate and practical relief before he is substantially injured. Therefore, the NASD is directed to resolved this dispute within 120 days.[13]

### IV. PROHIBITORY INJUNCTION: ENJOINING DEFAMATORY SPEECH

 Jordan seeks to enjoin MetLife from making any defamatory statements to his clients. He contends that MetLife has called his clients and made false and disparaging statements about the reasons for his termination. However, "absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metropolitan Opera Assoc., Inc. v. Local 100, H.E.R.E.I.,* 239 F.3d 172, 177 (2d Cir.2001); *see also Organization for a Better Austin v. Keefe,* 402 U.S. 415, 418–19, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *New Era Publ'n Int'l v. Henry Holt and Co.,* 695 F.Supp. 1493, 1525 (S.D.N.Y. 1988), *aff'd,* 873 F.2d 576 (2d Cir.1989) ("It is black letter law that injunctions are not available to suppress defamatory speech."). Enjoining such speech would be unconstitutional as a prior restraint on freedom of expression. "The special vice of a prior restraint is that the communication will be suppressed ... before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Prior restraints of future speech are particularly dangerous because of the difficulty courts face in

---

**13.** Generally, the NASD provides an expedited arbitration hearing when a court issues a preliminary injunction. *See* NASD Code of Arbitration Procedure § 10335(b) ("If a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief shall begin within 15 days of the date the court issues the temporary injunctive order."). Nonetheless, an expedited hearing is warranted here based on the alleged irreparable harm.

designing an order that does not chill protected speech. *See Latino Officers Ass'n, New York, Inc. v. City of New York,* 196 F.3d 458, 465 (2d Cir.1999).

 It is impossible for the Court to tailor an injunction that would prevent defamatory remarks while preserving Met-Life's interest in notifying Jordan's clients of his termination. MetLife should not be prevented from describing in general terms why Jordan was terminated. The speech concerns the alleged unethical conduct of an insurance agent who was entrusted with the financial planning of a large number of clients. Indeed, this speech is arguably within the sphere of legitimate public concern, which imbues the speech with a heavy presumption of constitutional protection. *See Vasbinder v. Ambach,* 926 F.2d 1333, 1339 (2d Cir. 1991); *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983).[14] This case does not have any extraordinary circumstances that warrant deviation from the well-established rule against preliminarily enjoining alleged defamatory speech.[15]

Although an injunction cannot be issued in this case, a serious concern remains that MetLife is in fact defaming Jordan to his clients. Elizabeth Laverty, one of Jordan's clients, testified that Dunn called her after Jordan's termination and insinuated that Jordan was a crook. *See* 7/16/03 Deposition of Elizabeth Laverty, Attachment to 7/21/03 Letter to the Court from Peter G. Eikenberry ("Eikenberry Ltr."), counsel for Jordan, at 35. Dunn allegedly told her that "[Jordan] was dishonest [and] not to trust him." *Id.* However, Dunn denies

that he told Laverty or any other MetLife client that Jordan was dishonest. *See* 7/16/03 Deposition of Frank Dunn, Attachment to Eikenberry Ltr., at 5–6.

Because of the risk that MetLife is lying to Jordan's clients and actively encouraging them to leave him and use a MetLife agent instead, any delay deciding the merits of this case will exacerbate Jordan's injuries.

## V. CONCLUSION

For the foregoing reasons, Jordan's motion for a preliminary injunction is denied. The NASD is directed to hold an expedited arbitration concerning claims regarding the disputed Form U–5 and defamation.

SO ORDERED.

---

**14.** Jordan does not cite any authority to support his argument that MetLife's speech is commercial speech, which is entitled to significantly less protection. *See* Plaintiff's Reply Memorandum at 7.

**15.** Factors such as intimidation and coercion are considered "extraordinary circumstances". *See Metropolitan Opera,* 239 F.3d at 177. Nevertheless, "current First Amendment principles may prohibit granting an injunction even when such factors are present." *Id.*