721 F.2d 98
 John CZURLANIS, Appellant,
v.
George J. ALBANESE, Union County Manager, James F. Delaney,
Director of Dept. of Central Services of Union County, Tony
Bonjavonni, Director of Motor Vehicles of Union County,
Louis DeVico, Director of Motor Vehicles of Union County,
James H. Carlin, Personnel Director of Union County, and
Board of Chosen Freeholders of Union County.
 No. 82-5566.
 United States Court of Appeals,
Third Circuit.
 Argued July 15, 1983.
Decided Nov. 9, 1983.
 
 Patricia Breuninger (argued), Breuninger, Karwell & Rubino, Scotch Plains, N.J., for appellant.
 Frank P. Addas (argued), James & Addas, Jersey City, N.J., James F. Keefe, Union County Counsel, Dept. of Law, Elizabeth, N.J., for appellees.
 Before SEITZ, Chief Judge, SLOVITER, Circuit Judge, and LORD, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 John Czurlanis, an employee of Union County, New Jersey, appeals from the denial of his motion for judgment notwithstanding the verdict. He contends that the defendants, the Board of Chosen Freeholders of Union County and certain present and former officials of Union County, violated his rights to freedom of speech. We conclude that Czurlanis' rights were violated as a matter of law, and therefore remand this case to the district court to determine damages proximately caused thereby.
 
 II.
 
 2
 Czurlanis began to work for Union County in 1971 as an auto mechanic and was later promoted to the position of senior mechanic. He was both a citizen and taxpayer of Union County, and often attended public meetings of the Union County Board of Chosen Freeholders ("Board"). Until May 1, 1976, the Board, which consists of nine elected officials, was the governing body of Union County and had both administrative and legislative responsibility. In November 1974 there was a change in the form of government, which was completed by May 1, 1976.
 
 
 3
 Under the new form of government the chief executive officer is a County Manager who is responsible for the day to day operation of the County government, while the Board has a general policymaking role. Defendant George J. Albanese was the County Manager during the relevant time period. As part of the County's reorganization, the County's Administrative Code was revised to establish what defendants have referred to as a "chain-of-command" policy. They rely on Article 10 of the Code, which provides:
 
 
 4
 1. Separation of Powers. The Board of Chosen Freeholders shall deal with County employees only through the County Manager, as the official responsible for the over-all executive management of the County's affairs. All contact with County administration of the County's government and provision of services, shall be through the County Manager, except as otherwise provided herein.
 
 
 5
 Nothing in this Code shall be construed to prohibit the Board's inquiry into any act or problem of the County's administration. Any Freeholder may require a report on any aspect of the government of the County at any time by making a written request to the County Manager. The Board may, by majority vote of the whole number of its members, require the County Manager to appear before the Board sitting as a Committee of the Whole, and to bring before the Board such records and reports, and such officials and employees of the County, as the Board shall deem necessary to insure clarification of the matter under study.
 
 
 6
 The Board further may, by majority vote of the whole number of its members, delegate any number of its members as an ad hoc committee to consult with the County Manager to study any matter and to report to the Board thereon.
 
 
 7
 It is the intent herein to vest in the Board such general legislative and such investigative powers as are germane to the exercise of its legislative powers, but to retain in the County Manager full control over the County administration and over the administration of County services.
 
 
 8
 Another aspect of the County's reorganization involved the creation of the Division of Motor Vehicles into which most motor vehicle operations were consolidated. On September 17, 1977, defendant Tony Bonjavonni was appointed its Director; defendant Louis DeVico was appointed Secretary to the Director.
 
 
 9
 On September 22, 1977, Czurlanis addressed a public meeting of the Board and made allegations concerning inefficiency, false reports, duplication, and unnecessary work on and parts for vehicles under the jurisdiction of the Division of Motor Vehicles in which he worked. He illustrated his remarks by reviewing in detail several work orders: one described the service as including inspection of a generator, its removal for testing, and its rebuilding on a vehicle that Czurlanis pointed out has no generator; it also referred to removal and testing of a Bendex spring on a vehicle part that Czurlanis explained had no Bendex spring. He also questioned the qualifications of the newly appointed Director of Motor Vehicles and the Secretary to the Director, whom he did not identify by name. He stated that the new Secretary had been the foreman in charge when the work orders in question were made.
 
 
 10
 Four days after Czurlanis' remarks at the meeting, he was transferred from the Westfield, New Jersey garage, which he had helped to organize and where he had worked since being hired in 1971, to what he considered a less desirable garage in Elizabeth, New Jersey. Defendant James F. Delaney, Director of the County's Central Services, initiated disciplinary action against Czurlanis seeking a 30-day suspension. After a departmental hearing, defendant James H. Carlin, County Personnel Director, found Czurlanis "guilty of a serious breach of discipline by his action on September 22, 1977 [at the Board meeting]" because "Czurlanis violated management procedures and good discipline by failing to present his complaints to his immediate supervisor and then proceeding through administrative levels to the County Manager if still dissatisfied with the handling of his complaint." Carlin recommended, and County Manager Albanese approved, a suspension without pay for 10 days instead of for 30 days as requested.
 
 
 11
 On March 22, 1979, Czurlanis again spoke at a public meeting of the Board. He suggested that a County practice of making facilities and personnel available to nonprofit organizations constituted involuntary charitable contributions by County taxpayers; he questioned the purpose of a resolution concerning a proposed cap on tax increases; he deplored a County practice of having its trucks wait in line for long periods to get stone or asphalt for repairs and made suggestions for correcting the problem; he criticized the design of the Road Department Garage in Scotch Plains and of a new garage extension; he proposed that the cause of water marks on the ceiling of the new County Administration Building should be corrected at the builder's rather than the taxpayers' expense; and he commented on the stabilization of tax rates in the County.
 
 
 12
 On April 16, 1979, Delaney wrote to Czurlanis that he would seek his dismissal because, inter alia, at the March 22, 1979 meeting Czurlanis "approached the Board ... and presented administrative business directly to the Board rather than follow the chain of command." After a departmental hearing, Carlin again found that "[b]y bringing department, management and operational procedure complaints and suggestions directly to the Public Meetings of the Board of Chosen Freeholders, Mr. Czurlanis violated management procedures and good discipline by his failure of proceeding through Administrative levels and then to the County Manager, if dissatisfied with the processing of his complaints." Carlin recommended, and Albanese approved, a 30-day suspension without pay instead of dismissal.
 
 
 13
 For more than a year after the second suspension, Czurlanis attended no Board meetings. He testified that he was afraid of losing his job if he attended further meetings, and that because of his superiors' reaction to his earlier participation, he was unsure what it was permissible to say, and therefore thought it was in his best interest to refrain from speaking at all. He continued to be transferred to various garages in the County but was never returned to the Westfield garage. Two petitions against him were circulated among his co-employees. In March 1982, Czurlanis elected to take early retirement at age 63.
 
 
 14
 Czurlanis filed this action under the First and Fourteenth Amendments to the United States Constitution, the New Jersey Constitution, and 42 U.S.C. Secs. 1983, 1985 and 1988 alleging defendants violated his right to freedom of speech and due process of law. Named as defendants were George J. Albanese, Union County Manager; James F. Delaney, Director of Department of Central Services of Union County; Tony Bonjavonni, Director of Motor Vehicles of Union County; Louis DeVico, then Secretary to and now the Director of Motor Vehicles of Union County; James H. Carlin, Personnel Director of Union County;[1] and the Board of Chosen Freeholders of Union County.
 
 
 15
 The matter proceeded to a jury trial. At the close of all of the evidence, Czurlanis moved for a directed verdict on his claim under the First Amendment. Counsel for Czurlanis argued that "the court has enough before it to rule that this speech was absolutely protected by the First Amendment", and asked the district court to rule that the issue of freedom of speech was not to be decided by the jury, which should instead decide the issue of proximate cause and damages. The court denied the motion without explanation. The court then submitted to the jury interrogatories covering both liability and damages.[2] The jury found defendants were not liable, and also answered the damages interrogatories awarding no damage. The court entered a "judgment of no cause for action." Plaintiff then moved for judgment n.o.v. alleging that as a matter of law defendants violated plaintiff's right to freedom of speech as protected by the First Amendment to the United States Constitution. The district court denied the motion without opinion.
 
 III.
 
 16
 Plaintiff has limited the issue on appeal to whether the court erred in submitting the question of defendants' liability under the First Amendment to the jury.[3] Were liability a jury issue, as the district court believed, we agree with plaintiff that the evidence permitted but one result. More importantly, in Connick v. Myers, --- U.S. ----, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983), the Supreme Court recently characterized "[t]he inquiry into the protected status of speech [as] one of law, not fact." The Court also stated that it, and a fortiori we as an intermediate appellate court, are obliged to make "an independent constitutional judgment on the facts of the case." Id. at 1692 n. 10. For the most part, the relevant facts here are not in dispute;[4] the parties differ primarily on their legal effect. Since our review on an issue of law would be plenary, we decide this issue now in the interest of judicial economy.
 
 
 17
 The keystone of any inquiry relating to the free speech rights of employees is the Supreme Court's decision in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There the Court emphasized that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment, but also recognized that the State has interests as an employer in regulating the speech of its employees. The Court held that the determination whether a public employee's speech is constitutionally protected requires balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568, 88 S.Ct. at 1734-35.
 
 
 18
 In Trotman v. Board of Trustees, 635 F.2d 216, 224-25 (3d Cir.1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981), we reviewed the three-step process usually required in examining a public employee's claim of retaliation for engaging in protected activity. See also Monsanto v. Quinn, 674 F.2d 990, 993 (3d Cir.1982). First, the plaintiff must show that the activity in question was protected. See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. If successful in demonstrating that the activity was protected, the plaintiff must then show that it was a substantial or motivating factor in the alleged retaliatory action. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, the defendant has the opportunity to defeat the plaintiff's claim by demonstrating that the same action would have been taken even in the absence of the protected conduct. Givhan v. Western Line Consolidated School District, 439 U.S. 410, 416-17, 99 S.Ct. 693, 697-98, 58 L.Ed.2d 619 (1979); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. at 287, 97 S.Ct. at 576.
 
 
 19
 In this case we need not dwell on the latter two steps. Defendants concede that the two suspensions of Czurlanis were the direct result of his speech at the two Board meetings. Albanese, Delaney and Carlin, who were the individual defendants responsible for these suspensions, each attributed these disciplinary actions to Czurlanis' public comments on those occasions. Each testified that Czurlanis was disciplined because he failed to follow the "chain-of-command." Indeed, both notices from the County relating to the suspensions directly tied the disciplinary actions to Czurlanis' participation at the Board's meetings.
 
 
 20
 We are therefore concerned primarily with the first step of the inquiry: whether Czurlanis' speech was protected. To determine that issue, we must first ascertain whether the speech dealt with a matter of public concern. In Connick the Court held that where a public employee's activity "cannot be fairly characterized as constituting speech on a matter of public concern," the reasons for a discharge or other disciplinary action are not subject to scrutiny by the courts. 103 S.Ct. at 1689-90. The Court said, "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id.
 
 
 21
 The essential distinction made in Connick was between speech by a public employee "as a citizen upon matters of public concern" and speech by "an employee upon matters only of personal interest." Id. at 1690. The Court stated:
 
 
 22
 We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 23
 Id. The Court observed that whether an employee's speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." Id.
 
 
 24
 In examining Czurlanis' statements at the public meetings of the Board on September 22, 1977 and March 22, 1979 to determine whether they involved matters of public import or employee grievances concerning "internal office affairs," it is apparent that they are in sharp contrast to the speech at issue in Connick. In Connick, the plaintiff, a former assistant district attorney who was unhappy about a transfer, contended she was dismissed for compiling and distributing a questionnaire to her coworkers concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. 103 S.Ct. at 1687. The Court held that with the exception of the last issue, the questions posed by plaintiff to her coworkers "do not fall under the rubric of matters of 'public concern' ". Id. at 1690. The majority viewed the questions as "mere extensions of [plaintiff's] dispute over her transfer to another section of the criminal court." Id. The Court stated,
 
 
 25
 [Plaintiff] did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did [she] seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [the District Attorney] and others .... These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre.
 
 
 26
 Id. at 1690-91 (footnote omitted).
 
 
 27
 Unlike the plaintiff in Connick, it appears that before Czurlanis addressed the public meeting of the Board on September 22, 1977, he was secure in his position at the Westfield garage. Indeed, he had been promoted to the position of senior mechanic, and found considerable satisfaction in his work.[5] But more important than the motivations underlying Czurlanis' participation in the Board meetings is the content of his speech, which falls squarely within the core public speech delineated in Connick. Czurlanis addressed the Board on precisely the questions which the Court in Connick noted were not the subject of the plaintiff's speech there, i.e., whether County officials in the Division of Motor Vehicle were "discharging [their] governmental responsibilities." Czurlanis sought to "bring to light actual or potential wrongdoing or breach of the public trust" on the part of these officials.
 
 
 28
 In considering the "content, form, and context" of the speech at issue in this case, we note that Czurlanis did not discuss his pay, his hours, or the conditions of his employment. Rather, he challenged practices of the Division of Motor Vehicles and of the County government generally that he considered inefficient, wasteful, and possibly fraudulent and, in some cases, made suggestions for correcting the problems. Unlike the plaintiff in Connick, Czurlanis spoke as a concerned citizen and taxpayer and not as an aggrieved employee. He protested the waste of taxpayer money and alleged serious deficiencies in record keeping. Moreover, he raised these matters before the Board, which was the body with legislative power and investigative power germane thereto. Cf. Rookard v. Health and Hospitals Corp., 710 F.2d 41, 46 (2d Cir.1983) (allegation of "corrupt and wasteful practices" at a large municipal hospital, made to city official empowered to investigate such charges, "obviously involves a matter of public concern"). He waited until the time set aside by the Board during its public meeting when citizens are invited to address the Board. Information concerning the functioning of a segment of the County government is of considerable public importance, and participation in a public meeting of elected representatives is a classic form of communicating such information. See McKinley v. City of Eloy, 705 F.2d 1110, 1114-15 (9th Cir.1983) (speech on competency of police force directed to public through city council meetings is matter of great public concern).
 
 
 29
 The fact that Czurlanis became aware of the matters which he raised at the Board meeting through his employment with the County does not make these matters any less issues of public concern. In this regard, the speech in question approximates that in Pickering. In Pickering, which involved a school teacher's dismissal for openly criticizing the Board of Education for its allocation of school funds, the Court observed that:
 
 
 30
 [T]he question whether a school system requires additional funds is a matter of legitimate public concern.... Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allocated to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.
 
 
 31
 391 U.S. at 571-72, 88 S.Ct. at 1736. Likewise, as a senior mechanic, Czurlanis was in a particularly good position to be aware of misallocation of resources in connection with motor vehicles and to inform the public and its legislative and investigative body. As we said in Monsanto,
 
 
 32
 We do not underestimate the internal unease or unpleasantness that may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which s/he believes merits review and reform. That is the price the First Amendment exacts in return for an informed citizenry.
 
 
 33
 674 F.2d at 1001. After considering the totality of the circumstances we conclude that the information conveyed by Czurlanis was of significant public, and not merely personal or private, interest.
 
 
 34
 As the Supreme Court made clear in Connick, it is the role of the court in a case alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary Pickering balancing. The Court repeated the statement of an earlier case that "we are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." 103 S.Ct. at 1692 n. 10 (emphasis added) (quoting Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946)). Accordingly, we must proceed with the balancing required by Pickering and consider the interest of the County "in promoting the efficiency of the public services it performs through its employees." See Monsanto v. Quinn, 674 F.2d at 996; see also Hughes v. Whitmer, 714 F.2d 1407, 1418 & n. 11 (8th Cir.1983); Rookard v. Health and Hospitals Corp., 710 F.2d at 46; Leonard v. City of Columbus, 705 F.2d 1299, 1304-06 (11th Cir.1983).
 
 
 35
 Defendants suggest that efficiency of public service was promoted by the County's chain-of-command policy. They describe plaintiff's speeches of September 22, 1977 and March 22, 1979 as "related to administrative matters which required plaintiff to follow the chain of command policy on personnel matters, safety conditions and record keeping." Brief for Appellees at 16. In his testimony, Albanese, the County Manager under whom the chain-of-command policy was established, admitted that there was nothing in writing that delineated what matters are covered by the chain-of-command policy and what matters would be regarded as appropriate for public speech by a County employee. Albanese interpreted the chain-of-command policy to require an employee to refrain from addressing the Board on issues such as waste, inefficiency, poor record keeping and misappropriation of vehicle parts without first raising those issues with the County officials "ultimately responsible."
 
 
 36
 Even if Albanese had informed Czurlanis of this broad interpretation of the chain-of-command policy, see supra note 4, we hold that such a policy cannot be used to justify the retaliatory action against Czurlanis under the rubric of the County's interest in promoting the efficiency of public service. It is simply incompatible with the principles that underlie the First Amendment to countenance a policy that would severely circumscribe in this manner speech on public issues, which occupies the "highest rung of the hierarchy of First Amendment values". NAACP v. Claiborne Hardware Co., --- U.S. ----, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982). A policy which would compel public employees to route complaints about poor departmental practices to the very officials responsible for those practices would impermissibly chill such speech. See Atcherson v. Siebenmann, 605 F.2d 1058, 1063 n. 5 (8th Cir.1979).[6] It would deter "whistle blowing" by public employees on matters of public concern. It would deprive the public in general and its elected officials in particular of important information about the functioning of government departments. We do not read the "efficiency of public services" factor referred to in Pickering to extend to a chain-of-command policy as interpreted and applied by the defendants.
 
 
 37
 Justice Brennan in his dissenting opinion in Connick referred to some of the factors which may appropriately be considered under Pickering as relevant to the government's interest:
 
 
 38
 whether the statements are directed to persons with whom the speaker "would normally be in contact in the course of his daily work" ; whether they had an adverse effect on "discipline by immediate supervisors or harmony among coworkers" ; whether the employment relationship in question is "the kind ... for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning" ; and whether the statements "have in any way impeded [the employee's] proper performance of his daily duties ... or ... interfered with the regular operations of the [office].
 
 
 39
 103 S.Ct. at 1700 (quoting Pickering, 391 U.S. at 568-73, 88 S.Ct. at 1734-37). See also Monsanto v. Quinn, 674 F.2d at 994.
 
 
 40
 In this case, there is no evidence that the relationship between Czurlanis and his immediate superiors was seriously undermined or that the operations of the Division of Motor Vehicles were disrupted--factors that would "weigh[ ] against, not for, first amendment protection in the Pickering balance." Sprague v. Fitzpatrick, 546 F.2d 560, 566 (3d Cir.1976), cert. denied, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); see also Trotman v. Board of Trustees, 635 F.2d at 230. Moreover, defendants do not allege that Czurlanis' remarks were knowingly or recklessly false. See Pickering, 391 U.S. at 574, 88 S.Ct. at 1737.
 
 
 41
 Although defendants maintain that Czurlanis' address of September 22, 1977 was a personal attack on his newly appointed supervisor, Louis DeVico, Secretary to the Director of Motor Vehicles, and undermined personnel morale, there is no evidence that a needed close working relationship was destroyed. Unlike Sprague, where the relationship that was "completely undermined" was between the District Attorney and his First Assistant, here Czurlanis was a mechanic and consequently was not "normally in contact" with the individual defendants, County administrators, "in the course of his daily work." See Pickering, 391 U.S. at 569-70, 88 S.Ct. at 1735-36. In Sprague we observed that "[t]he crucial variant in [the Pickering ] balance appears to have been the hierarchical proximity of the criticizing employee to the person or body criticized." 546 F.2d at 564. See also Monsanto v. Quinn, 674 F.2d at 995. Czurlanis' position in the hierarchy was not such that "it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." Id. at 570. See McGee v. South Pemiscot School District, 712 F.2d 339, 342 (8th Cir.1983) (school board not immediate supervisors of teacher and teacher's criticism of school policies "would not affect [his] ability to function as a teacher"); Berdin v. Duggan, 701 F.2d 909, 912 (11th Cir.1983) (no close working relationship between maintenance crewman and town mayor), cert. denied, --- U.S. ----, 104 S.Ct. 239, 77 L.Ed.2d --- (1983).
 
 
 42
 Nor do the defendants contend that Czurlanis' statements "have in any way impeded [the] performance of his daily duties," Pickering, 391 U.S. at 572, 88 S.Ct. at 1737, or "interfered with the regular operation" of the County government. Id. at 573, 88 S.Ct. at 1737. Although several coworkers signed petitions and wrote letters indicating a desire not to work with Czurlanis further, which might indicate that they were disturbed by his remarks at the Board meetings, it appears that at least one of the petitions was instigated by defendant DeVico and that the letters were solicited by him. Thus the disruption, if any, was primarily the result, not of the plaintiff's exercise of speech, but of his superiors' attempts to suppress it.
 
 
 43
 But even if there were some evidence of disruption caused by the plaintiff's speech, such a finding is not controlling. Rather, as the Fifth Circuit has pointed out:
 
 
 44
 The First Amendment balancing test [of Pickering ] can hardly be controlled by a finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office .... The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.
 
 
 45
 Porter v. Califano, 592 F.2d 770, 773-74 (5th Cir.1979) (emphasis in original). See also Monsanto v. Quinn, 674 F.2d at 996. Likewise, the Court in Connick emphasized that "the state's burden in justifying a particular discharge varies depending on the nature of the employee's expression." 103 S.Ct. at 1692-93. Although the Court stated that there was no "necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," id. at 1692, it cautioned that "a stronger showing [of disruption] may be necessary if the employee's speech more substantially involve[s] matters of public concern." Id. at 1692-93. The Court recognized that "such particularized balancing is difficult," but directed that "the courts must reach the most appropriate possible balance of the competing interests." Id. at 1692. Here, Czurlanis' speech clearly involved matters of substantial interest to the public, while defendants have made at best a weak showing of actual or even potential disruption. Therefore, we conclude that Czurlanis' speech was protected under the First Amendment.
 
 IV.
 A.
 
 46
 It follows from the foregoing that Czurlanis was entitled at least to a judgment of liability. It would ordinarily remain for the jury to determine whether the action of which plaintiff complains was proximately caused by the exercise of protected speech and, if so, the amount of damages. Since defendants here do not dispute that plaintiff's participation in the Board meetings was the sole cause of the two disciplinary actions taken against him, which resulted in suspensions of 10 and 30 days respectively, upon remand, plaintiff is entitled to recover the amount of pay he lost during those suspensions.[7]
 
 
 47
 Plaintiff has also claimed damages as a result of alleged harassment and what he charges was his constructive discharge leading to his early retirement. Defendants have not challenged that these are proper elements of damage if there was sufficient evidence thereof. There was conflicting testimony as to these items. Although defendants construe the jury's interrogatory answers as finding there was no damage in the circumstances of this case we cannot accept that as a binding determination. The issue of defendants' liability was erroneously submitted to the jury. Because it erroneously decided that there was no violation of free speech, it should never have reached the damages issue. Its response on that issue was surplusage and must be disregarded. See McCollum v. Stahl, 579 F.2d 869, 870-72 (4th Cir.1978), cert. denied, 440 U.S. 912, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979). Therefore, on remand, plaintiff is entitled to have the issue of proximate cause as to these items of damage and their amount submitted to a jury under proper instructions following an explanation of the protected nature of the speech in question.
 
 B.
 
 48
 It remains to consider the position of the different defendants. A local government, such as a county, is liable under section 1983 when the action at issue "may fairly be said to represent official policy." Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). The defendants attribute Czurlanis' suspensions to his failure to abide by the County's chain-of-command policy. The individual defendants were acting in their official capacities pursuant to their interpretation of that policy. It follows that the County defendant, the Board of Chosen Freeholders of Union County, is liable as a matter of law for the damages resulting from the suspensions. See also Rookard v. Health and Hospitals Corp., 710 F.2d at 45; McKinley v. City of Eloy, 705 F.2d at 1116; Berdin v. Duggan, 701 F.2d at 913-14; Schneider v. City of Atlanta, 628 F.2d 915, 920 (5th Cir.1980). Because of the posture in which the case was presented on appeal, the parties have not addressed whether the County would also be liable for the additional items of damage claimed for harassment and alleged forced retirement, and we express no opinion on that issue.
 
 
 49
 In contrast to the County, the individual defendants are entitled to qualified immunity if they can show that their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Before the Harlow decision, the availability of qualified immunity could turn on an official's subjective good faith which some courts regarded as a question of fact requiring resolution by a jury. Because the Harlow Court viewed such inquiries as "peculiarly disruptive of effective government," id. at 817, 102 S.Ct. at 2738, it discarded the subjective good faith test and substituted an objective test which focuses on "the objective legal reasonableness of an official's conduct." Id. at 818, 102 S.Ct. at 2739. We interpret that opinion as instructing the lower federal courts that the issue of qualified immunity would ordinarily be one of law for determination by the courts.
 
 
 50
 The Court stated, "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time the action occurred." Id. (footnote omitted). If the law was not clearly established, the defendant will prevail on summary judgment on the basis of the qualified immunity defense, id. at 818, 102 S.Ct. at 2739, unless the plaintiff claims that the official actually knew that s/he was violating the law. See id. at 821, 102 S.Ct. at 2740 (Brennan, J., concurring). If, on the other hand, the applicable law was clearly established, then, as the Court noted in Harlow, it should have been known to "a reasonably competent public official," and the qualified immunity defense "should ordinarily fail" unless the defendant "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." Id. at 818-19, 102 S.Ct. at 2739. See generally Forsyth v. Kleindienst, 551 F.Supp. 1247, 1260-61 (E.D.Pa.1982), opinion sur grant of stay, 700 F.2d 104 (3d Cir.1983).[8] If Czurlanis continues to press his claim against the individual defendants on remand, the district court must decide under the Harlow standard whether one or more of them is entitled to qualified immunity.
 
 V.
 
 51
 For the foregoing reasons, we will reverse the judgment of the district court and remand for further proceedings in conformity with this opinion.
 
 
 
 *
 Honorable Joseph S. Lord, III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 At the close of plaintiff's case, the court dismissed the complaint as to Carlin. Plaintiff does not challenge the dismissal
 
 
 [2]
 The interrogatories and the jury's responses were:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 [3]
 In light of our disposition of the case, we need not reach plaintiff's contention that the County's chain-of-command policy concerning the public speech of its employees is unconstitutionally vague and overbroad
 
 
 [4]
 Defendants contend that at a meeting of mechanics which Czurlanis attended he heard details pertaining to the chain-of-command policy and that he was aware of the full meaning of chain-of-command. Czurlanis testified that he was never told the chain-of-command policy applied to matters other than employee grievances concerning wages, hours, and terms of employment. We may accept defendants' version since disposition of this appeal does not turn on whether Czurlanis was aware that the policy in fact precluded him from speaking to the Board as he did
 
 
 [5]
 Although defendants' brief suggests that Czurlanis "apparently was disappointed in not being promoted to foreman," Brief for Appellees at 13, they have cited no evidence in the record to support the suggestion that Czurlanis' speech was motivated by personal dissatisfaction on that basis
 
 
 [6]
 Since we have concluded that Czurlanis' speeches did not concern private matters relating to his employment, we need not consider whether a public body may properly require channeling all such complaints through an existing grievance procedure. See Hickory Fire Fighters Ass'n v. City of Hickory, 656 F.2d 917, 921 (4th Cir.1981) (availability of grievance procedure does not justify abridgement of speech)
 
 
 [7]
 Because plaintiff has proven some damages, we need not invoke the rule of Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978), holding that plaintiffs who successfully show a constitutional violation are entitled to recover at least nominal damages even absent proof of actual injury
 
 
 [8]
 Since Harlow, the courts have generally decided qualified immunity as a matter of law, see Ellsberg v. Mitchell, 709 F.2d 51, 69 (D.C.Cir.1983); Segarra v. McDade, 706 F.2d 1301, 1306 (4th Cir.1983); Silverman v. Ballantine, 694 F.2d 1091, 1096 (7th Cir.1982); Green v. White, 693 F.2d 45, 47 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); Ward v. Johnson, 690 F.2d 1098, 1111-13 (4th Cir.1982) (in banc), unless defendants have claimed extraordinary circumstances even though the law was clearly established. See Barnett v. Housing Authority, 707 F.2d 1571, 1582-83 (11th Cir.1983)