**William T.M. JOHNSON, Appellant,**

v.

**LINCOLN UNIVERSITY OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION, Lincoln University, Lincoln University, Pennsylvania and Herman R. Branson, individually and as President of Lincoln University, Lincoln University, Lincoln University, Pennsylvania and Andrew M. Bradley, Benjamin F. Amos, Carl O. Dickerson, Lynn Marie Fields, Robert T. Freeman, Jr., Maceo W. Hubbard, Dr. Shirley A. Jackson, George M. Leader, Leroy A. Patrick, Leroy Robinson, Jr., Stephen B. Sweeney, John H. Ware, III, Franklin H. Williams, J. Peter Williams, Esq., Vahan H. Gureghian, Esq., Eddison R. Hairston, Jeremiah Heartley, William H. Rivers, Jr., Howard E. Wright, Osmond H. Brown, James D. Barber, Cecil DuBois Gallup, Freeman P. Hankins, Paul McKinney, Charles Bush, Theodore R. Robb, Patricia D. Jacobs, Esq., Gordon Linton, and Dr. Kenneth Sadler, As Trustees of Lincoln University, Lincoln University, Lincoln University, Pennsylvania.**

No. 85–1068.

United States Court of Appeals, Third Circuit.

Argued Sept. 12, 1985.

Decided Nov. 6, 1985.

---

444

Frank Finch, III (argued), McDaniel, Wheeler & Finch, Philadelphia, Pa., for appellant.

Kenneth C. Frazier (argued), J. Freedley Hunsicker, Jr., Horace D. Nalle, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for appellees.

Before SEITZ, BECKER and ROSENN, Circuit Judges.

### Opinion of the Court

SEITZ, Circuit Judge.

### I.

The plaintiff, Dr. William T.M. Johnson, appeals from a final order of the district court granting summary judgment in favor of the defendants, Lincoln University, Herman R. Branson, former president of Lincoln University, and the trustees of Lincoln University. Johnson brought this action alleging that his termination by Lincoln violated 42 U.S.C. § 1983 (1982) by depriving him of rights under the First and Fourteenth Amendments to the United States Constitution. He alleged also that the circumstances of his termination gave rise to various pendent state law claims including breach of contract, defamation, and intentional infliction of emotional distress. This court has jurisdiction under 28 U.S.C. § 1291 (1982).

### II.

This case arises from a bitter and long-standing dispute which has rent the academic community at Lincoln University in Chester County, Pennsylvania, for more than eight years. Despite the inappropriateness of this forum for resolving issues of academic policy and academic freedom, we find ourselves once again reviewing charges that the termination of a tenured Lincoln faculty member was inspired not on the grounds set forth in Lincoln's Faculty Bylaws, Art. III, para. 9, but by the desire to suppress speech and activity critical of the Lincoln administration in violation of the faculty member's First Amendment rights.

### A.

In order properly to understand the context of this dispute, a short historical review will be helpful. Lincoln University is a part of the Commonwealth of Pennsylvania System of Higher Education. It is both financed and regulated by various Commonwealth authorities.[1] Lincoln has been described as "the country's oldest college in continuous existence for the higher education of black students." *See Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216, 219 (3d Cir.1980), *cert. denied,* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981) (*Trotman*). Dr. William T.M. Johnson had been teaching at Lincoln for twenty years at the time of his termination in 1983. The first black chemist to work for the DuPont Co., Dr. Johnson left that company and took a substantial cut in pay to teach at Lincoln. The

---

1. The presence of state action for purposes of section 1983 is not contested here.

record reveals that Dr. Johnson has a history of high academic achievement and a substantial commitment to achieving equal opportunity for black people.

In 1977, a wide scale dispute broke out at Lincoln, initially over a proposed drastic reduction in the number of faculty that would have increased the student-faculty ratio to comport with Pennsylvania Department of Education guidelines. Before it was over, the dispute, "which pit[ted] the president and administration ... against at least a quarter of the faculty, [involved the] dismissal of a dissenting faculty member, disruption of classes, arrest of faculty members, attempted stifling of debate and other sorry incidents." *Trotman*, 635 F.2d at 219.

Among the events of that tumultuous period was the removal of Johnson from the chairmanship of the Chemistry Department, a removal characterized as " 'a retributive action' " on the part of President Branson in a petition signed by 25 of Johnson's colleagues. *Id.* at 221. Johnson was apparently " 'in the forefront of the faculty dissidents and was quite outspoken in his criticism of President Branson.' " *id.*, quoting the district court opinion in that case.

Seventeen members of Lincoln's faculty, most of whom are no longer employed at Lincoln, brought suit against President Branson, the trustees, and Lincoln itself, alleging that various disciplinary actions had been taken in order to suppress faculty criticism of university policy. In that case, the district court dismissed the action at the completion of the plaintiffs' case, finding generally that there had been a reasonable basis for each administration action complained of, and that those actions were "totally unrelated" to the plaintiffs' exercise of their First Amendment rights. As our court noted, the district court found no attempt to suppress or inhibit any constitutionally protected activity. *Trotman*, 635 F.2d at 219.

We reversed, holding that the district court had erred in its determination that the plaintiffs' activities were not protected by the First Amendment, and that it had used an incorrect legal standard in determining whether the defendants' alleged retaliatory actions would have occurred in the absence of the protected activity. While we did not evaluate each and every instance of assertedly protected activity, we did focus on Johnson's letter to the Governor of Pennsylvania seeking Branson's removal as president of the university. We pointed out that "[s]peech with far less claim to legitimacy than a telegram by a faculty member at a state-related institution to his Governor has been held to fall within the scope of the First Amendment." *Trotman*, 635 F.2d at 226.

### B.

The *Trotman* case was remanded, and ultimately settled. A consent decree was issued on September 22, 1982. Among its terms was a pledge by the University to refrain from violating any of the plaintiffs' constitutional rights. In addition, it stated that "[f]aculty members ... shall have the rights to freedom of expression as guaranteed by the First Amendment ... and the defendants shall not take or threaten any retaliatory action because of the exercise of such rights." Settlement Agreement page 1.

Barely four months later, on February 1, 1983, a formal complaint seeking Johnson's dismissal was filed by Dr. S.C. SubbaRao, Chairman of the Chemistry Department. Dr. SubbaRao levied numerous charges against Johnson based mainly on events which took place in the context of a rancorous, longstanding dispute within the chemistry department. Many of the events charged in the complaint took place well before the signing of the consent decree.

The charges were formalized and presented in somewhat expanded form to Lincoln's Judicial Committee, which is composed of three faculty members elected by the faculty and one appointed by the President, in April of 1983. After a hearing, the Judicial Committee recommended termination of tenure. The Committee found Johnson culpable in three basic areas and supported its decision by reference to a

host of facts and events which we will not detail. First, it found that Johnson departed "from commonly accepted standards of morality and competency in regard to his relationship with his students based on his authoritarian and insensitive behavior." Judicial Committee Report page 3. Second, it found that Johnson's conflicts within the Chemistry Department were not justified by his commitment to higher academic standards, which the committee found suspect, and that he had engaged in "a series of attacks that included defamatory charges, physical and personal threats and obstructionalism (sic)." *Id.* Finally, it found Johnson culpable of threats and intimidation with regard to his failure to finish an assignment under a biomedical grant; of insubordination for "attempts to have the Middle States Association [of Colleges and Schools] deny accreditation to Lincoln," *id.*, with respect to its Master of Human Services Program, and to have the Association investigate academic standards generally at the University; and of violation of the University's master key policy.

President Branson terminated Johnson on July 30, 1983, and Johnson appealed to the Board of Trustees, which upheld Branson's decision in October of 1983. Prior to the appeal to the Board, in July 1983, Johnson filed a motion before the district court alleging that Lincoln was terminating him in retaliation for his role in the *Trotman* litigation and the activities which gave rise to it, in violation of the consent decree. Johnson asked the district court to find Lincoln in contempt. The district court found "ample evidence that Dr. Johnson's dismissal was due to his unacceptable performance these past few years as a faculty member," and found no violation. Memorandum of Decision page 3, Aug. 30, 1983.

### C.

This section 1983 action followed in December, 1983. Dr. Johnson alleged that his termination was in retaliation for constitu-

tionally protected speech and activity, and that the circumstances of his termination violated his right to due process in the termination proceedings.[2] In addition, Johnson advanced several pendent state law claims. The defendants answered that Johnson's federal claims were res judicata in light of the outcome of the contempt proceedings, and that the evidence did not establish any violation of Johnson's constitutional rights.

The district court held that because a showing of contempt requires proof of a willful violation of the consent decree by clear and convincing evidence, *Schauffler v. Local 1291, International Longshoremens Ass'n,* 292 F.2d 182 (3d Cir.1961), rather than the preponderance of evidence standard normally applicable in civil cases, the holding in the contempt proceedings did not bar relitigation of the issues under the less demanding standard of proof, *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). This holding is not challenged here.

With regard to Johnson's constitutional claims, the district court granted defendants summary judgment, concluding that there was no denial of due process and that the statements for which Johnson was terminated were not protected by the First Amendment. Finding no merit in Johnson's federal claims, the court declined to exercise pendent jurisdiction over the state claims.

### III.

It is perhaps appropriate to set forth at this juncture what this appeal does not involve, at least insofar as the First Amendment claims go. Neither this court nor the district court is part of an appellate review process for state university tenure termination hearings. In this case, as in *Trotman,* the plaintiff raises due process and other issues, but the central claim is

---

**2.** When this case was reassigned to the same district judge who heard the *Trotman* case, plaintiffs moved for his disqualification, asserting, *inter alia,* that his prejudice against the

plaintiff was manifested in the *Trotman* litigation. The plaintiff challenges the denial of this motion in this appeal, but we find that his arguments lack merit.

that a state proceeding has been used to suppress and retaliate against the exercise by a state employee of his right to free speech. Moreover, the plaintiff alleged not only that some of the activities of which the Judicial Committee found him culpable were protected by the First Amendment, but also that the termination proceedings themselves were initiated in order to retaliate against him for exercise of his right to free speech. Many of the activities for which he claims the defendants retaliated were not included in the charges presented to the Judicial Committee. Thus, we are not confined to the record compiled by Lincoln's Judicial Committee in evaluating Johnson's claims.

■ The central inquiry in this case involves not a "substantial evidence" or "arbitrary and capricious" scrutiny of the Judicial Committee proceedings but "an independent examination of the record ... in order that the controlling legal principles may be applied to the actual facts of the case." *Pickering v. Board of Education,* 391 U.S. 563, Appendix 578 n. 2, 88 S.Ct. 1731, Appendix 1740 n. 2, 20 L.Ed.2d 811 (1968). Here we are hampered by the absence of a complete factual record.

■ The controlling principles are set forth in a line of cases which hold "that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). The Third Circuit's leading case reviewing the "three-step process ... required in examining a public employee's claim of retaliation for engaging in protected activity," *Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983), is *Trotman v. Board of Trustees of Lincoln University.* There we explained:

First, the plaintiff must show that s/he engaged in protected activity. *See Pickering v. Board of Education,* 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811] (1968). In that case the Court stated that 'the interests of the [employee] as a citizen, in commenting upon matters of

public concern' must be balanced against 'the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees,' *id.* at 568 [88 S.Ct. at 1734], and held that comment on matters of legitimate public concern by public school teachers is ordinarily protected activity. Second, a claimant who demonstrates that the activity was protected must then show that the activity was a substantial or motivating factor in a decision or action taken against the claimant. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287 [97 S.Ct. 568, 576, 50 L.Ed.2d 471] (1977). Third, the defendant can still defeat plaintiffs' claim by demonstrating that the same action would have been taken even in the absence of the protected conduct. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416–17 [99 S.Ct. 693, 697, 58 L.Ed.2d 619] (1979); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 287 [97 S.Ct. at 576].

*Trotman,* 635 F.2d at 224–25.

### A.

The first stage, then, is to conduct the balancing test required by *Pickering* in order to see whether the plaintiff was engaged in protected activity. At the outset, we note the Supreme Court's recent pronouncement that if the plaintiff's activities

cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [his] discharge.... When employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.... [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circum-

stances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick v. Myers,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90.

■ It is implicit in *Connick* that the court must examine each activity which the employee claims provided the actual motivation for his termination to see whether it "touch[es] . . . upon a matter of public concern." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. *See Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983). The inquiry into whether the employee is in fact correct that the activity motivated his termination, of course, comes at the second stage of the analysis, *Mt. Healthy City School District Board of Education,* 429 U.S. at 287, 97 S.Ct. at 576.

The district court limited its application of the *Pickering* test to those charges against Dr. Johnson which it thought could be interpreted as protected speech. Those charges, while they include many specific incidents, may be collected into two categories: first, controversies within the Chemistry Department, which often degenerated into name-calling and shouting matches, and in which was exhibited great personal animosity; and, second, the letters that Dr. Johnson sent to the Middle States Association of Colleges and Schools regarding the Master of Human Services program and low academic standards generally.

The district court held that the issues in the first category were "only of interest within the confines of the chemistry department." Memorandum of Decision, January 11, 1985, at 17. Regarding the letters, it held that, "[w]hile the loss of accreditation would usually be a matter of public concern, the charges leveled by Dr. Johnson are merely an outgrowth of his personal dispute with the university." *Id.* at 18. Finding that the statements were "of purely private concern," the district court conducted a balancing test and found that Dr. Johnson's interest in making such statements was "outweighed by Lincoln's inter-

est in preserving the effective functioning of the chemistry department and the university." *Id.*

■ We hold that the district court erred as a matter of law when it concluded that those activities did not involve matters of public concern. First, we must point out that the mere fact that an employee's statement is an "outgrowth of his personal dispute" does not prevent some aspect of it from touching upon matters of public concern, as *Connick* itself makes clear. In *Connick,* an assistant district attorney circulated a questionnaire concerning certain matters of office policy motivated primarily by "an employment dispute concerning the very application of that policy to [the employee]." *Connick v. Myers,* 461 U.S. at 153, 103 S.Ct. at 1693. Despite the personal motivation of Myers' speech, the fact that "one of the questions in Myers' survey touched upon a matter of public concern," *id.* at 149, 103 S.Ct. at 1691, mandated the scrutiny of the Court and application of the *Pickering* balance. If, in fact, the employee's speech is largely composed of matters of only personal concern, that becomes relevant when the balancing is done, not in the determination whether the speech touches upon matters of public concern. The court, then, cannot make a superficial characterization of the speech or activity taken as a whole; to do so would undermine the entire purpose of the *Pickering* test. Instead, it must conduct a particularized examination of each activity for which the protection of the First Amendment is claimed.

■ With respect to the controversies within and concerning the policies, academic and otherwise, of the Chemistry Department, neither the internal nature of the forum, *see Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979) (First Amendment freedoms not lost when a public employee arranges to communicate privately with his employer rather than to spread his views before the public), nor the tone of the communications, *see Trotman,* 635 F.2d at 225 ("criticism of Branson and

his policies and methods ... is core speech squarely encompassed within the First Amendment ... [and] not deprived of the protection of the First Amendment merely because it was strident"), controls whether this speech touched upon a matter of public concern. Speech touches upon a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. at 146, 103 S.Ct. at 1690.

 In this case, while personal disputes may have generated many of the events in the chemistry department, the record reveals that at least some of the controversy concerned questions of educational standards and academic policy of a scope broader than their application within the department. For instance, in a memorandum to the faculty [3] dated December 9, 1980, requesting censure of Dr. SubbaRao, Johnson in effect traces the source of personal disputes within the department over enrollment in his classes and other, more petty problems, to his concern for the reputation of Lincoln University and the future of its students.

> I believe such grade inflation is a kind of crime against students, Lincoln University, and Black people. Standards of Black Colleges are always suspect and it took 50–60 years for Lincoln to earn a high reputation for quality education and high standards. As many of our students learn to their sorrow: inflated grades and easy courses don't help you— they hurt you, and teachers who give inflated grades and easy courses are not your friends.... What SubbaRao has done is to encourage non-quality education and non-quality character.... A good reputation for academic quality was the only thing of value Lincoln ever had or ever will have. This is why the faculty should censure his actions.

It is difficult to imagine a theme that touches more upon matters of public concern. This theme runs consistently through Johnson's dealings with SubbaRao, even predating the *Trotman* period. *See* Johnson's letter to SubbaRao, November 10, 1977. Certainly, questions of academic standards are of "apparent ... interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Connick v. Myers*, 461 U.S. at 149, 103 S.Ct. at 1691.

 Similarly, Dr. Johnson's letters to the Middle States Association clearly touch almost entirely upon matters of public concern. In those letters, Dr. Johnson criticized a master's degree program that admitted students without a bachelor's degree and required only a tenth grade literacy level. He stated, "The academic standards for Black institutions and the qualifications of Black people are still suspect in America. This 'Master's Degree' program will provide strong ammunition to support such beliefs." Letter of May 9, 1980. He proceeded to connect the decline of academic standards at Lincoln with the demoralization caused by the suppression of academic freedom during the *Trotman* controversy, and encouraged the Middle States Association to investigate Lincoln. "Those individuals and organizations who understand the vital importance of high educational standards to the future of mankind—and the special circumstances that make it a kind of crime to allow lower standards at Black institutions—must act to uphold high standards." *Id.* The same theme runs through all the letters to the Middle States Association which were presented to the Judicial Committee and formed a basis for its finding of insubordination.

In *Trotman*, we held that a similar letter by Johnson to the Governor of Pennsylvania not only touched upon a matter of public concern, but also constituted protected activity. Indeed, it is difficult to see any distinguishing features between these

---

3. This memorandum was part of the evidence submitted to the Judicial Committee and was cited as a basis of its finding of culpability.

letters and the one which the *Pickering* Court held to be protected activity. In *Pickering*, a teacher wrote a letter to a local newspaper in connection with a proposed school tax increase that was critical of the way in which the school administration handled bond issues and allocations of financial resources. The Supreme Court held that "a difference in opinion between Pickering and the Board as to the preferable manner of operating the school system ... clearly concerns an issue of general public interest." *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736.

 The district court also erred in confining itself to some of the charges brought before the Judicial Committee, whereas plaintiff's grievance was much more extensive, including activities many of which were not contained in the formal charges. Johnson claims that his role as a named plaintiff in the *Trotman* litigation, his role in the underlying activities leading up to that litigation, his longstanding criticisms of President Branson's administration on academic policy, his newspaper articles proposing that Lincoln eliminate the "F" grade, his attempts to have other faculty members censured for allowing students to take advanced courses without passing the prerequisites, and his criticisms of his department chairman over academic standards are the real reasons for his termination. These claims are clearly relevant to Johnson's claims of retaliation, and, in fact, support a cause of action for retaliatory termination in violation of his First Amendment rights even if none of the activities with which he was formally charged were protected. That they touch upon matters of public concern seems hardly open to question. Indeed, some, such as the criticisms of Branson and other activities involved with the *Trotman* case, have already been held to be protected activity in that case.

 Were it not for the fact that this case is before us on an incomplete record

after summary judgment, we could decide now whether the activities which the plaintiff claims motivated his termination are protected or not, because our review of such matters is plenary. "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. We hesitate to do so under the circumstances, however, and we will remand for consideration after development of a full record of whether the events related to the chemistry department and the letters to the Middle States Association constituted protected activity, and whether the other activities touched upon matters of public concern and are protected by the First Amendment.[4]

 In that context, we note that whether speech touches on a matter of public concern is determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers*, 461 U.S. at 147–48, 103 S.Ct. at 1690. Context is important, too, in determining whether speech that actually touches upon a matter of public concern is, in fact, protected activity. This court has already held that:

[it] is particularly important that in cases dealing with academia, the standard applied in evaluating the employer's justification should be the one applicable to the rights of teachers and students 'in light of the special characteristics of the school environment,' *see Tinker v. Des Moines Independant Community School District*, 393 U.S. 503, 506 [89 S.Ct. 733, 736, 21 L.Ed.2d 731] (1969), and not that applicable to military personnel who must meet the 'overriding demands of discipline and duty.' *Parker v. Levy*, 417 U.S. 733, 744 [94 S.Ct. 2547, 2556, 41 L.Ed.2d 439] (1974); *Cf. Gasparinetta v. Kerr*, 568 F.2d 311 (3d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978).... In an academic environment, suppression of speech or opinion cannot be justified by

---

4. Because of our disposition of this case, we do not need to reach Johnson's contention that summary judgment was erroneously granted be-

cause of the existence of disputed issues of material fact.

an 'undifferentiated fear or apprehension of disturbance,' *Tinker v. Des Moines Independent Community School District,* 393 U.S. at 508 [89 S.Ct. at 737] nor by 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.' *Id.* at 509 [89 S.Ct. at 738].

*Trotman,* 635 F.2d at 230.

Particularly with respect to the more broadly based criticisms of President Branson, the letters to the Middle States Association, the activities involved in *Trotman,* and Johnson's campaigns in the faculty meetings, the academic context and the fact that these controversies took place apart from any close working relationships with immediate supervisors appear to distinguish these activities from those in *Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir.1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), cited to us by appellees, and in *Connick* itself, *see* 461 U.S. at 151–52, 103 S.Ct. at 1692–93. We recognize that those controversies that took place *within* the chemistry department present a more complex problem. However, "even if there were some evidence of disruption caused by plaintiff's speech, such a finding is not controlling. 'The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.' " *Czurlanis v. Albanese,* 721 F.2d at 107, *quoting Porter v. Califano,* 592 F.2d 770, 774 (5th Cir.1979). We note further the Supreme Court's words in *Connick*

> that the state's burden in justifying a particular discharge [in the context of the *Pickering* balance] varies depending upon the nature of the employee's expression.... [W]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.... We caution that a stronger showing [of the employer's justifica-

tion] may be necessary if the employee's speech more substantially involved matters of public concern.

*Connick v. Myers,* 461 U.S. at 150–52, 103 S.Ct. at 1692–93.

**B.**

▇ Assuming without deciding that after trial the district court holds that some of Johnson's activities are protected by the First Amendment, the second and third questions as set forth in *Trotman* should be submitted to the jury, the plaintiff having requested a jury trial in his complaint. In view of the already protracted nature of this litigation, we think that the interests of judicial economy dictate that we address certain issues which may well confront the district court on remand.

▇ Both the second and third stages of this process involve questions of causation. However, the move from the second to the third stage involves a shift in the burden of proof. In the second stage, the plaintiff has the burden of showing that the protected activity was a substantial or motivating factor in his termination. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In the instant case, those activities for which Johnson was found culpable were admittedly considered in his termination, and were seemingly substantial or motivating factors, as evidenced by the Judicial Committee report. With respect to the other activities, Johnson will have the burden of proving that the charges were indeed a "subterfuge," and that there really was a "conspiratorial and carefully planned effort to remove plaintiff from the University in retaliation ... for his criticism and other activities," as alleged in his complaint.

▇ Should the jury find that any or all of the protected activities were substantial or motivating factors in Johnson's termination, it must then consider whether the defendants have met their burden of show-

ing by a preponderance of the evidence not that they *could* have terminated Johnson, but that they *"would* have reached the same decision as to respondent's [termination] even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576 (emphasis added).

## IV.

■ Johnson claims that the termination proceedings against him were conducted in such a way as to deprive him of his tenured position, in which he had a property interest, without due process of law. We have examined each of his arguments [5] and do not believe that the record relevant to them shows any due process violations. "[T]he administration of the internal affairs of a college and especially the determination of professional competency is a matter peculiarly within the discretion of a college administration.... Due process should not be employed to insure that the exercise of discretion is 'wise' but only that it is not unreasonable, arbitrary or capricious." *Chung v. Park,* 514 F.2d 382, 387 (3d Cir.), *cert. denied,* 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975).

## V.

The judgment of the district court will be affirmed with respect to the dismissal of the procedural due process claims and the denial of the recusal motion.

The judgment of the district court will be vacated to the extent that it granted defendants summary judgment on plaintiff's First Amendment claims. Because of our ruling on the federal claims, we will also vacate its dismissal of the pendent claims. The case will be remanded to the district court for further proceedings consistent with this opinion.

5. Johnson claims he was denied due process because: 1) he had inadequate notice of the substance of the charges against him; 2) the evidence against him was not disclosed in a timely fashion; 3) President Branson was not present as required in the By-laws and his absence was prejudicial; 4) the panel was not neutral and detached; 5) Johnson was not effectively heard; and 6) Johnson could not effectively cross-examine witnesses.