OPINION OF THE COURT
GEORGE C. PRATT, Circuit Judge:

INTRODUCTION

Plaintiff James C. Feldman claims the defendant Philadelphia Housing Authority (“PHA”), through its agents, defendants Jonathan A. Saidel and John Paone, violated the *827 First and Fourteenth Amendments of the Constitution of the United States, as well as the State of Pennsylvania’s “whistleblower” statute, by firing him in retaliation for publishing reports that exposed wrongdoing at PHA. After a jury trial the district court entered judgment for plaintiff on all claims, awarding him $616,696 in compensatory damages and a total of $20,000 in punitive damages. Defendants appeal. We affirm.

FACTS AND BACKGROUND

Since the jury found for Feldman, we view the facts by drawing from the evidence all reasonable inferences in his favor.
Defendant PHA, a public agency responsible for providing housing for low-income citizens, is the largest housing agency in Pennsylvania and fourth largest in the United States. The agency is governed by a board of commissioners consisting of five members, two each being appointed by the mayor and the city controller, respectively, with the fifth member being selected by the four appointees.
In January 1990 Saidel, exercising his authority as Philadelphia’s city controller, appointed himself to the board of commissioners. Three months later, Paone was named as PHA’s new executive director, responsible for overseeing the day-to-day activities of the agency. Paone and Saidel worked closely together, routinely discussing the daily management and affairs of PHA.
Feldman had been working at PHA since 1982. From May 1990 until his termination on May 3, 1991, Feldman acted as the director of the agency’s Internal Audit Department. In this capacity, Feldman was responsible for investigating, identifying, and exposing waste, inefficiency, fraud, and criminal activity within PHA. In order to carry out this function, Feldman regularly prepared detailed reports of his investigations. Under the internal-audit charter, which specifies the responsibilities of the Internal Audit Department, Feldman was required to present his findings and observations to the executive director and the board of commissioners, i.e. to Paone, as executive director; and to Sai-del, as chairman of the board of commissioners as well as to the four other members of the board.
For most of Feldman’s career at PHA, his work was considered exemplary. His personnel file contained no reprimands or comments concerning poor job performance. His last performance evaluation, dated April 24, 1990, gave Feldman a rating of “SUPERIOR”. However, after Saidel became chairman of the board and Paone became executive director, things changed. In several of his reports on PHA’s management and operations over approximately the next twelve months, Feldman revealed numerous improprieties in several key areas at the agency. As required by the internal auditing charter, Feldman made his reports to Paone, Saidel, and the rest of the board.' Many of his reports criticized the job PHA’s management was doing. On several occasions, Paone and Saidel reprimanded Feldman for preparing the critical reports.
Paone was particularly displeased with Feldman after he reported that management had promoted a PHA employee who was under investigation for corruption. As a result of a tip, the Internal Audit Department had conducted an investigation of PHA’s Central Maintenance Department. The investigation revealed that the Central Maintenance Department, which was responsible for the agency’s fencing contracts, was involved in an illegal bid-rigging scheme, and several PHA employees were linked to the unlawful activity. Feldman periodically reported to Paone and Saidel on the details of this investigation, including which PHA employees were probably involved. Ultimately, Feld-man reported that one of the implicated employees had been promoted despite being under the continuing investigation. Paone challenged Feldman, saying, “I thought you were on our side”. Paone then instructed Feldman to remove from his report the reference to the mid-investigation promotion. Feldman complied.
Later, after Feldman circulated a quarterly report to the board that criticized certain other managerial decisions, Paone and Saidel separately reprimanded Feldman and instructed him that in the future he was to report his findings to Paone only. Feldman *828 refused to yield to this direction, because it was contrary to the internal-audit charter, and he continued to circulate his reports to the entire board.
The last matter that Feldman worked on that was to be circulated to the board was a human-resources audit. The purpose of the audit was to determine if PHA management was using its employees in an efficient and economical manner. Feldman had routinely advised the board and Paone of the progress of the audit. The final audit report would have revealed favoritism and other improprieties in personnel decisions made by Paone and Saidel. In general, the audit was very critical of the manner in which PHA was being run.
Around the same time, however, Paone and Saidel were portraying their management of PHA to the public in a different light. Saidel prepared a “Letter from the Chairman” that was featured in PHA’s 1991 annual report. The letter stated that although the agency had previously been “financially floundering”, when he became chairman and Paone became executive director, “[t]hings had to change fast — and they did”. He went on to say that the board of commissioners “began to reorganize PHA management and restore the Authority to a viable condition”. Moreover, in the “Letter from the Executive Director”, also featured in the annual report, Paone said that PHA’s greatest challenge was “to win the hearts, minds and respect of our residents and to develop a team approach with them in resolving other major issues”. Had it been published, Feldman’s human resources audit report would have severely undercut the annual report’s glowing portrayal of management’s success.
The same day the human-resources report was to be circulated to the board, Paone, after conferring with Saidel, fired Feldman. He told Feldman that, effective immediately, his services were no longer needed, because the agency had decided to reorganize the Internal Audit Department. Feldman was then promptly escorted out of his office by two police officers, without being given an opportunity to retrieve his work or publish the audit report.
Four months later, Feldman instituted this action in district court against PHA, Paone, and Saidel, and against other PHA board members who were dismissed from the action as defendants at the completion of plaintiff’s case-in-chief. Feldman alleged that defendants had fired him for “whistleblowing”, in violation of the first and fourteenth amendments, 42 U.S.C. § 1983, and 43 P.S. § 1423(a) and (b) (the Pennsylvania “Whistle-blower” Law).
The case was tried before the Honorable William H. Yohn, Jr. and a jury, which returned a verdict in favor of Feldman and against defendants PHA, Saidel, and Paone. The jury awarded Feldman $616,696 in compensatory damages, of which $500,000 was for front pay. It also awarded Feldman punitive damages against Paone and Saidel in their individual capacities, in the amount of $10,000 each. Defendants now appeal. We have jurisdiction under 28 U.S.C. § 1291.
Defendant PHA raises three issues on appeal:
1) whether the district court erred in not granting judgment as a matter of law dismissing the first amendment and “whistle-blower” claims; 2) whether the district court erred by allowing an award of front pay instead of reinstating plaintiff at PHA; and 3) whether the jury’s $500,000 award for front pay was excessive.
Both Paone and Saidel argue that the evidence was insufficient to justify punitive damages. Saidel also challenges the award of punitive damages against him, claiming a lack of evidence to establish that he personally participated in Feldman’s firing.
We affirm.

DISCUSSION

Review of a denial of a directed verdict is plenary, and we invoke the same standard that the district court applies. Thus, viewing the evidence in the fight most favorable to Feldman, the nonmoving party, we determine whether there is evidence reasonably tending to support his claim. See Bielevicz v. Dubinon, 915 F.2d 845, 849 (3d Cir.1990). While the role of an appellate *829 court, in a first amendment case, requires an enhanced examination of the entire record, see Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984), “[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict”. Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir.1994).
A. First Amendment Claim
Feldman recovered, in part, on a theory that his firing was in retaliation for his having engaged in speech protected under the first amendment. Determining whether PHA’s dismissal of Feldman violated the first amendment requires a three-step analysis. See Swineford, 15 F.3d at 1270; Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir.1983). Feldman was first required to show that his speech constituted protected activity. See Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). If protected, Feldman then had to establish that the speech was a substantial or motivating factor for his discharge. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If Feldman satisfied the first two steps, then defendants could avoid liability by showing that they would have fired Feldman anyway. Id.
1. Constitutionally Protected Activity
A state cannot lawfully discharge an employee for reasons that infringe upon that employee’s constitutionally protected interest in freedom of speech. Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). A public employee’s freedom of speech, however, does have its limits. The court must weigh the employee’s interest in free speech against the government’s interest in promoting efficiency among its employees. See Versarge v. Township of Clinton New Jersey, 984 F.2d 1359, 1364 (3d Cir.1993). As the Supreme Court explained in Pickering:
The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
391 U.S. at 568, 88 S.Ct. at 1734-35. It is for the court, not the jury, to perform the Pickering balancing test. See Czurlanis, 721 F.2d at 105 (“As the Supreme Court made clear in Connick, it is the role of the court in a ease alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary Pickering balancing.”).
Thus, in order to determine whether Feldman’s speech was protected, we must first determine if the speech related to matters of public concern, or constituted merely personal grievances, see Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); Pickering, 391 U.S. at 568, 88 S.Ct. at 1734, and looking at the entire record, we must consider the content, form, and context of the speech for which Feldman contends he was fired. See Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690.
An employee’s speech addresses a matter of public concern when it can “be fairly considered as relating to any matter of political, social or other concerns of the community”. Id. at 146 [103 S.Ct. at 1690]. Feldman’s speech was not related in any way to personal grievances; on the contrary, it clearly pertained to matters of important public concern. The very purpose of his auditing reports was to ferret out and highlight any improprieties that he found at PHA. Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern. See Swineford, 15 F.3d at 1274.
Next we must balance Feldman’s interests in engaging in the speech, together with the public’s interest in listening, against defendants’ interest in promoting efficiency at PHA. Id. The interests of Feldman, as well as the public, in, exposing governmental wrongdoing of the nature and magnitude that Feldman’s reports exposed, is very strong. We have recently recognized:
*830 Speech involving government impropriety occupies the highest rung of First Amendment protection. Moreover, the public’s substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing.
Swineford, 15 F.3d at 1274.
Defendants, however, stress in opposition the disruptive impact of Feldman’s speech which, they argue, was sufficient to deprive it of constitutional protection. This argument is misplaced. We have previously explained:
The First Amendment balancing test [of Pickering] can hardly be controlled by finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office * * *. The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.
Czurlanis, 721 F.2d at 107 (quoting Porter v. Califano, 592 F.2d 770, 773-74 (5th Cir.1979)) (emphasis in original). Moreover, revelations of misconduct at PHA by Feldman stand in a unique position. Feldman was not the typical employee exposing fraud within one’s work environment; he was the head of a department whose very job it was to uncover improprieties. Feldman’s conduct was not only permitted, but required by the Internal Audit Department’s charter, which provided:
It is the policy of the Philadelphia Housing Authority (PHA) to determine the adequacy and effectiveness of management policies, controls and procedures with respect to all activities within PHA, and to insure full compliance with such policies, controls and procedures.
In order to implement this objective, it is the policy of PHA to provide and support an Internal Audit Department to determine the adequacy and effectiveness of management policies, controls and procedures in discharging management’s responsibilities for the control of assets and operations * * *.
(emphasis added).
As director of the Internal Audit Department, Feldman was responsible for uncovering and reporting any wrongdoing that he discovered at PHA. If done correctly, Feld-man’s very job was to be disruptive. His responsibility to investigate and ferret out improprieties extended not only to Feldman’s co-workers, but also to Paone, the executive director, and yes, even Saidel, the chairman of the board. The charter specifically provided that the Internal Audit Department must “determine the adequacy and effectiveness of management policies, controls and procedures in discharging management’s responsibilities for the control of assets and operations”, (emphasis added).
Exposing waste, fraud, and corruption within an agency will likely cause disruption, particularly when done by a person whose responsibility it is to unveil such conduct. This type of disruption, however, cannot justify a retaliatory discharge.
At the time of his firing, Feldman was about to publish an audit report that would have revealed wrongdoing on the part of Paone and Saidel. Feldman, however, was fired the day the report was to be published. The jury could have reasonably concluded that this was no coincidence, especially in light of the fact that after being fired, Feld-man was escorted from his office by two police officers, and prevented from either circulating the report or even retrieving any of his work.
Very likely, publication of the report would have caused some disruption at PHA, particularly between Feldman and his superiors, Paone and Saidel. Defendants would have us believe, however, that the disruption would have been great enough to justify, under Pickering balancing, their firing of Feldman. We disagree. Feldman did what the charter required him to do; failure to do so would have been a breach of his responsibilities. Moreover, the subject matter of his reports — improprieties in governmental business — occupies a high level of public concern. Simply because his reports might cause dis *831 ruption in the eyes of Paone and Saidel, the very people he was reporting on, could not be a sufficient justification for his discharge. We conclude that Feldman’s speech was constitutionally protected.
Our conclusion that Feldman’s speech was constitutionally protected rests on three propositions: (1) that speech was a matter of public concern; (2) the interests of Feldman and the public in exposing governmental wrongdoing of the nature and magnitude that Feldman’s report exposes is very strong; and (3) while Feldman’s speech caused disruption, he was performing precisely the task that he was employed to perform. With respect to each of these propositions, there is no material dispute of fact. Because there is no difference between the facts as found and the facts as the defendants may have viewed them at* the time, this case does not present the issues recently addressed by the Supreme Court in Waters v. Churchill, — U.S. -, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).
2. Unconstitutional Discharge
Feldman contended that his discharge was caused by defendants’ retaliatory motives. The record is replete with evidence from which the jury could properly conclude that Feldman’s firing was directly precipitated by his engaging in protected speech. Initially, defendants told Feldman that the reason he was being fired was that they were reorganizing the audit department. This, the jury could have found, was a pretext. Except for a few minor changes, the audit department was substantially the same at the time of trial as it was when Feldman was fired.
Defendants later abandoned their initial reason for the firing, and launched an intense attack on Feldman’s ability to perform his job. They alleged, inter alia, that Feldman was insubordinate, self-serving, and overall, an incompetent employee. Their attack on Feldman’s alleged incompetence as the reason for his dismissal raised a jury issue. Incidentally, the argument is substantially undercut by PHA’s present contention that Feldman should be reinstated at PHA instead of receiving front pay. Because there is ample evidence to support the jury’s finding that Feldman was fired for engaging in protected activity, we affirm the jury’s determination that defendants violated Feldman’s constitutional rights.
Defendants also argue that the district court committed reversible error by failing to conduct, on the record, particularized fact-finding and balancing under Pickering. They further contend that the district court inappropriately submitted to the jury all of Feldman’s statements and reports before first determining for itself which, if any, were protected. Defendants, however, have failed to preserve these issues for appeal. They did not except to the court’s jury instruction concerning Pickering, nor did they take any pre-verdict exception to the district court’s failure to make specific factual findings on the record.
Even if defendants had properly preserved the record, we would still affirm. Although the district court did not perform the Pickering balancing test in precisely the fashion that some cases suggest is appropriate, it is apparent from the district court’s memorandum and order denying defendants’ motion for judgment notwithstanding the verdict, that it had considered all of Feld-man’s speech to be constitutionally protected under Pickering. Consequently, we see no prejudicial error in the court’s having first submitted the same issue to the jury, which arrived at the same conclusion. [1]
B. Front Pay Versus Reinstatement
PHA argues that the district court erred by permitting an award of front pay instead of ordering Feldman reinstated at PHA. The equitable remedy of reinstatement is available for discharges that violate 42 U.S.C. §.1983, see Versarge, 984 F.2d at 1368, and reinstatement is the preferred remedy to cover the loss of future earnings. See Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir.1987). However, reinstatement is not the exclusive remedy, because it is not always feasible, such as when there exists “irreparable animosity between the. parties”. Id. at 374; see also Versarge, 984 F.2d at 1368. When reinstatement is not appropriate, front pay is the alternate reme *832 dy. See Maxfield v. Sinclair International, 766 F.2d 788, 796 (3d Cir.1985), cert. denied, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). Guided by the particular circumstances of a case, the district court has broad discretion in determining whether reinstatement is appropriate, and its determination is reviewed under an abuse-of-diseretion standard. See id.
Although Feldman initially requested reinstatement in his complaint, he sought, prior to trial, to have reinstatement excluded as a potential remedy. The district court deferred its ruling until after both sides had presented their evidence to the jury. Then, having heard all the evidence, the district court held that reinstatement was not feasible, because “irreparable distrust and animosity developed between Feldman and PHA as a result of the events prior to his termination, the termination itself, and the litigation that followed in its wake”. The district court also concluded that the “lawsuit irrevocably impaired [Feldman’s] ability to function as an auditor at PHA”. Consequently, the district court submitted to the jury the issue of the amount of front pay that Feldman should be awarded.
PHA also argues that because Paone and Saidel are no longer with PHA, the animosity is no longer present. Even on this appeal, PHA has joined Paone and Saidel in their continuing, albeit unsuccessful attack on Feldman’s professional competence and personal integrity. The record contains ample evidence of the hostility that was caused by this litigation. The facts surrounding Feld-man’s firing, together with defendants’ litigation strategy, are but two examples of the irreparable animosity that resulted. We conclude that the district court did not abuse its discretion in allowing front pay rather than reinstatement.
During this litigation, PHA offered Feld-man another position at the agency. However, having determined that the district court did not abuse its discretion in permitting the alternate remedy of front pay, we need not address the effect of Feldman’s rejection of the offer.
Contrary to PHA’s contention, neither Feldman nor the court was bound by Feldman’s alternative request for reinstatement made in the wherefore clause of his complaint. Relief is determined by the merits of the case, not by the pleadings. Rule 54(e) of the Federal Rules of Civil Procedure provides that “every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party’s pleadings.” Fed.R.Civ.P. 54(c).
In short, we see no reason at this late date to overturn the district court’s determination, fully supported by the record when made, that front pay was appropriate relief in the circumstances of this case.
C. Amount of Front Pay
PHA asserts that even if some front pay was appropriate, the jury’s award of $500,000 was excessive, considering Feldman’s age, experience, and future likelihood of employment. While PHA’s argument is cast in terms of excessiveness, it, at times, seems to be faulting the district court for failing to instruct the jury on mitigation of damages, i.e., on what the jury should do if it believed Feldman would be capable of securing other employment at some point prior to retirement age. The district court did instruct the jury on this point, however. Its charge was not materially different from that requested by the defense and was not objected to by it. The court’s instruction was:
“Now, award of front pay or future damages is used to make the plaintiff whole for future expected losses. In calculating such an award, you must consider the expected future damages caused by defendants’ wrongful conduct from the date of judgment to the date of retirement by the plaintiff, less any wages and benefits he might receive during that same period of time. In other words, future damages in this case consists of what Mr. Feldman would have earned in wages and benefits working at PHA, less whatever he earns from any other employment he undertakes from the date judgment is entered to the date of his expected retirement.
*833 If PHA proves that Mr. Feldman unjustifiably failed or fails to take a new job of like kind, status and pay which is available to him or he fails to make reasonable efforts to find a new job, you must also subtract any amount he could have earned in that new job after today.”
Based on these instructions, the jury awarded to Feldman front pay of $500,-000. The jury’s verdict may not be disturbed unless the record is critically devoid of the minimal amount of evidence upon which the jury could have reached its verdict. See Swineford, 15 F.3d at 1265; Dutton v. Wolpoff and Abramson, 5 F.3d 649, 653 (3rd Cir.1993). On this record, we think that the evidence supports the jury award.
Feldman’s actuarial-economic expert testified extensively on plaintiffs lost future income, making several sophisticated calculations that produced various figures, depending upon which criteria he applied. The $500,000 award, however, was over $30,000 less than the lowest figure calculated by Feldman’s expert. Defendants called no expert of their own, and they offered no evidence to controvert the testimony of Feld-man’s expert.
The jury’s award, therefore, was sufficiently supported by the evidence, and we do not think that $500,000 is so excessive as to shock the conscience of this court. See Sarvarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir.1989).
D. Punitive Damages
The jury awarded punitive damages against Paone and Saidel, in their individual capacities, in the amount of $10,000 each. Both of them contend that their conduct here does not sink to the level that would permit punitive damages. In addition, Saidel argues that he should not have been found hable for punitive damages because he did not have sufficient involvement with Feldman’s firing. We disagree with both contentions.
Punitive damages are authorized on Feldman’s federal and state law claims.
In a § 1983 action:
[A] jury may be permitted to assess punitive damages * * * when the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.
Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Similarly, the Pennsylvania Supreme Court has stated that “punitive damages may be awarded for conduct that is outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747 (1984) (internal quotations omitted).
It is true that Paone’s conduct was more culpable than Saidel’s. The record contains evidence, however, from which the jury could reasonably have concluded that Saidel not only knew about and acquiesced in, but also directed Paone’s firing of Feldman for engaging in his constitutionally protected speech. Saidel and Paone worked closely together on PHA matters, and Feldman’s reports implicated both Saidel and Paone in the mismanagement of PHA Paone testified that before firing Feldman, he spoke with Saidel about the matter and that Saidel “concurred” with the decision to terminate Feldman. Paone further testified that he and Saidel discussed the reorganization of the Internal Audit Department, one of the pretextual reasons initially offered for their discharge of Feldman. However, the Internal Audit Department, with only a few minor changes, remained the same. In response to written interrogatories, defendants admitted that the only step taken to reorganize the department was that the director of the Internal Audit Department “no longer reports to the Board of Commissioners but reports to the Executive Director”.
The jury could reasonably have inferred that Paone would not have engaged in the unlawful firing of Feldman without first consulting with and obtaining Saidel’s approval, that Saidel thus participated in the retaliatory firing of Feldman; that they fired him in order to conceal their own mismanagement at PHA; and that this conduct sank to the levels of conduct that justify imposition of punitive damages under both federal and Pennsylvania law. We conclude that both *834 Paone and Saidel must pay the modest punitive damages the jury assessed against them.
We have considered defendants’ remaining arguments and find them to be similarly without merit.

CONCLUSION

The judgment of the district court is affirmed.

. See, e.g., Robinson, 982 F.2d at 899 (3d Cir.1993) (affirming district court's denial of reinstatement where evidence supported finding of lingering hostilities between plaintiff and his supervisors); Versarge v. Township of Clinton, 984 F.2d 1359, 1369 (3d Cir.1993) (holding reinstatement inappropriate "because of the great animosity between plaintiff and the other volunteer firefighters”); Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 322 (8th Cir.1993) (upholding district court’s denial of plaintiffs’ request for reinstatement to former teaching positions on grounds that (1) school district and school building were very small; (2) record was filled with testimony regarding tense and hostile atmosphere at school between plaintiffs, individual defendants, and other teachers; and (3) friction that precipitated lawsuit would dog the school districts if plaintiffs were returned to their positions); Tennes v. Commonwealth of Mass. Dep’t of Revenue, 944 F.2d 372, 381 (7th Cir.1991) (affirming denial of reinstatement where there was no reason to believe that parties would enjoy a productive and amicable working relationship); Spulak v. K Mart Corp., 894 F.2d 1150, 1157 (10th Cir.1990) (affirming award of front pay in lieu of reinstatement where record supported Spulak’s assertion that K Mart's investigation of Spulak's alleged illegal activities “left his employees with the impression that he was guilty of wrongdoing, rendering him unable to function amicably and productively in his former supervisory capacity',” and where the level of animosity between Spulak and K Mart only increased as a result of the litigation).