**Thomas G. BAILOR, Plaintiff,**

v.

**Stanley TAYLOR, Robert Snyder, Carl Danberg, Paul Howard and James Lupinetti, Defendants.**

No. 99–627 JJF.

United States District Court, D. Delaware.

Oct. 31, 2001.

Laurence V. Cronin, Esquire of Smith, Katzenstein, & Furlow, Wilmington, DE, for Plaintiff.

Michael F. Foster, Esquire of Department of Justice, Wilmington, DE, for Defendants.

### *MEMORANDUM OPINION*

FARNAN, District Judge.

## I. Introduction

Plaintiff was employed as an investigator by the Delaware Department of Corrections Internal Affairs Unit in August of 1997. (D.I.61). An inmate riot occurred at the Delaware Correctional Center on August 21, 1997. (D.I.61). The following day, Robert Snyder, the Deputy Warden, held a debriefing meeting to ascertain whether the riot was handled properly by correctional officers. (D.I. 45 at 4). In addition to Robert Snyder, Paul Howard, the Director of the Bureau of Prisons, and all correctional officers involved in the riot were present at the debriefing. (D.I. 45 at 4). At the debriefing, there were no complaints about any correctional officers' conduct. (D.I. 45 at 4).

Shortly thereafter, Correctional Officer Dominique Brown reported to Plaintiff that certain correctional officers had used excessive force against inmates during the riot. (D.I.61). Plaintiff informed his supervisor, James Lupinetti, Director of Internal Affairs, about Dominique Brown's allegation. (D.I. 45 at 4). James Lupinetti relayed this information to Commissioner Stanley Taylor, who then directed Plaintiff to investigate Dominique Brown's allegation. (D.I. 45 at 4).

On September 26, 1997, Plaintiff issued a report to James Lupinetti, which detailed the results of Plaintiff's investigation. (D.I. 45 at 5). Specifically, Plaintiff's report concluded that Dominique Brown's allegation that certain correctional officers used excessive force against inmates during the riot was supported by evidence. (D.I. 49 at 7–8). The report

was reviewed by James Lupinetti, Stanley Taylor, Chief Deputy Assistant Carl Danberg, and Paul Howard (collectively, Plaintiff's "superiors"). (D.I. 45 at 5).

Plaintiff's superiors criticized his report because it allegedly contained unsupported conclusions and was vague, lengthy, and difficult to read. (D.I. 45 at 6). For these reasons, Plaintiff was directed to revise his report. (D.I.61). Plaintiff, however, expressed concern to James Lupinetti that deleting such conclusions from the report would demonstrate an effort to "cover-up" the possible illegal conduct of certain correctional officers. (D.I. 49 at 9, 13; D.I. 61). Plaintiff contends that James Lupinetti responded by threatening to terminate Plaintiff if he did not revise the report. (D.I. 49 at 9). Plaintiff, allegedly fearing termination, complied with this directive and submitted a revised report on October 9, 1997. (D.I.61). Plaintiff, however, was again directed to revise his report by his superiors because it allegedly still contained unsupported conclusions and was poorly written. (D.I. 45 at 6). Again, Plaintiff complied with his superiors' directive to revise the report, and submitted a second revised report the following day. (D.I.61).

Plaintiff contends that since he had been employed with the Department of Corrections Internal Affairs Unit, his work had never been criticized for containing unsupported opinions or conclusions. (D.I. 1 at 5). Additionally, Plaintiff contends that he was unfairly criticized and alienated by Defendants after he expressed his view that there was a "cover-up." (D.I. 67 at 4). Plaintiff also contends that Defendants held a secret meeting where they conspired to "come after" him. (D.I. 67 at 7). Moreover, Plaintiff contends that he was ignored by James Lupinetti and not given any substantive assignments. (D.I. 49 at 14). Finally, Plaintiff contends that his

health deteriorated during this time period, which his doctor determined was likely the result of work related stress. (D.I. 67, Tab 6 ¶ 10).

In February of 1998, Plaintiff resigned from his position with the Department of Corrections. (D.I. 67, Tab 6 ¶ 11). Three days after his resignation, Plaintiff was employed with a financial institution at roughly the same salary. (D.I. 45 at 13).

## II. Procedural History

On September 20, 1999, Plaintiff filed a Two–Count Complaint against Defendants. (D.I. 67, Tab 3). In Count I, Plaintiff asserts that Defendants' actions constitute an unlawful retaliation, in violation of Plaintiff's right of free speech under the First Amendment of the United States Constitution. (D.I. 67, Tab 3). In Count II, Plaintiff asserts that he was constructively discharged because Defendants' unlawful retaliatory conduct made the conditions of his employment so intolerable that any reasonable person would feel compelled to resign. (D.I. 67, Tab 3).

On September 18, 2000, a pretrial conference was held. (D.I.67). At the conference, the Court was persuaded to cancel the trial that was scheduled to proceed that morning. (D.I.60). Specifically, with regard to Plaintiff's Unlawful Retaliation Claim, Defendants conceded that if the Court were to determine that Plaintiff's speech was protected under the First Amendment, then their conduct would be retaliatory. (D.I. 67, Tab 1 at 13). Additionally, Defendants conceded that the facts surrounding Plaintiff's Constructive Discharge Claim were undisputed. (D.I. 67, Tab 1 at 14). Accordingly, because it appeared that there were no triable issues of fact, the Court canceled trial and ordered the parties to submit letter memoranda on the issues of constructive dis-

charge and protected speech. (D.I. 67, Tab 1 at 15–17).

This Memorandum Opinion will address the issues raised by the parties in their letter memoranda (D.I. 67; D.I. 69; D.I. 70).

## III. Discussion

### A. Whether Defendants Unlawfully Retaliated Against Plaintiff

A claim for unlawful retaliation under the First Amendment consists of three elements. First, a Plaintiff is required to establish that he has a protected First Amendment right. Specifically, a Plaintiff must demonstrate that his speech is a matter of public concern and that the value of his speech outweighs the interest of the state government in promoting effective and efficient public service through its employees. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Whether a protected First Amendment right exists is a question of law. *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir.1994)(citing *Czurlanis v. Albanese*, 721 F.2d 98, 105 (3d Cir.1983)). Second, if a protected right is found to exist, a Plaintiff must then demonstrate that the Defendant retaliated against him. Specifically, a Plaintiff must establish that his protected speech was a substantial or motivating factor in a Defendant's decision to take adverse action against him. *Swineford v. Snyder County*, 15 F.3d 1258, 1270 (3d Cir.1994). Finally, if a Plaintiff establishes retaliation, the burden then shifts to a Defendant to demonstrate that he would have taken the same action absent the protected speech. *Id.* It is well recognized that the second and third "retaliation" elements of an unlawful retaliation claim generally involve questions of fact. *Watters v.*

*City of Philadelphia,* 55 F.3d 886, 892 n. 3 (3d Cir.1995); *Suppan v. Dadonna,* 203 F.3d 228, 233 (3d Cir.2000).

The parties disagree as to whether the statements made by Plaintiff in his report and his expression of a "cover-up" are protected under the First Amendment. Additionally, despite the concessions made at the pre-trial conference in this case, the parties also disagree as to whether Defendants' conduct was retaliatory. The Court will address the parties' arguments.

### 1. Whether The Statements Made By Plaintiff In His Report Are Protected Speech Under The First Amendment

█ The parties agree that Plaintiff's speech is a matter of public concern. (D.I. 67, Tab 1 at 4). Accordingly, in determining whether a protected First Amendment right exists, the Court must only turn to the parties' arguments regarding whether Plaintiff's speech outweighs Defendants' interest in promoting effective and efficient public service.

Plaintiff contends that the interest of the public in exposing governmental impropriety occupies the highest degree of First Amendment protection, and while his speech may have caused disruption, Plaintiff was performing precisely the job that he was hired to perform. (D.I. 67 at 3–4). In response, Defendants contend that Plaintiff's repeated and unreasonable allegation of a "cover-up" resulted in a drastic deterioration of the relationships between Plaintiff and his superiors and co-workers, which in turn caused substantial disruption in the workplace. (D.I. 45 at 24). Additionally, Defendants contend that because there is no evidence of misconduct on their behalf or a "cover-up," Plaintiff's speech is entitled to little weight when compared to Defendants' interests in promoting effec-

tive and efficient public service. (D.I. 45 at 20).

█ When balancing the value of Plaintiff's speech against Defendants' interests, the Court must consider whether Plaintiff's behavior was disruptive. Specifically, whether Plaintiff's behavior impairs discipline by superiors, harms co-worker relationships, detrimentally impacts Plaintiff's working relationships with others, impairs Plaintiff's performance or interferes with the employer's operation. *Swineford,* 15 F.3d at 1272 (stating that "[t]hese interests are referred to collectively as 'disruption.'"). At the same time, the Court recognizes that the public's interest in uncovering governmental impropriety occupies the highest degree of First Amendment protection, and requires the Court to support legitimate whistle blowing. *Feldman,* 43 F.3d at 830 (citing *Swineford,* 15 F.3d at 1274).

After reviewing the parties arguments and the applicable law on this issue, the Court concludes that the value of Plaintiff's speech substantially outweighs Defendants' interests. By his status as an Internal Affairs investigator, Plaintiff was required and expected to independently investigate and report wrongdoing by the employees of the Department of Corrections. Thus, when Plaintiff issued his initial report confirming Dominique Brown's allegation that excessive force was used by other correctional officers during the inmate riot, Plaintiff was performing precisely the job he was hired to perform. In this regard, the disruption alleged by Plaintiff's superiors was to be expected. Certainly, there is no evidence that Plaintiff fostered undue disruption by reporting his findings and conclusions to his superiors. (D.I. 67, Tab 1 at 13). Accordingly, in light of the high degree of protection afforded to speech involving government impropriety and the level of disruption ar-

gued by Defendants, the Court cannot conclude that the value of Plaintiff's speech is outweighed by Defendants' interest in promoting efficient public service. *See Feldman*, 43 F.3d at 830. Therefore, the Court concludes that Plaintiff's speech is a protected right under the First Amendment.

### 2. Whether Defendants' Conduct Was Retaliatory

At the pre-trial conference, Defendants conceded that if the Court determined that Plaintiff's speech was protected under the First Amendment, then their conduct would be retaliatory. (D.I. 67, Tab 1 at 13). Defendants, however, have retracted this concession. (D.I.69).

▮▮▮ Defendants now contend that genuine issues of material fact exist as to whether their conduct was in fact retaliatory. Specifically, Defendants contend that they did not discipline or transfer Plaintiff, and that Plaintiff received assignments from James Lupinetti up until the day Plaintiff resigned. (D.I. 45 at 13–14). Further, Defendants contend that Plaintiff completely alienated himself from his supervisors and co-workers after he concluded that there was a "cover-up." (D.I. 45 at 13).

In response, Plaintiff contends that the Defendants should not be permitted to retract their concession. However, in the event that the Court permits a retraction, Plaintiff agrees with Defendants that a genuine issues of material fact exist. In contrast to Defendants' assertions, Plaintiff contends that he was effectively relegated to a "dead end" position by Defendants as a result of his speech, and not because he alienated himself from his supervisors and co-workers. (D.I. 70 at 3).

▮▮▮ After reviewing the record and the arguments of the parties, the Court will permit Defendants to retract their concession because the issue of retaliation does generally involve questions of fact that a jury must resolve. *Watters*, 55 F.3d 886, 892 n. 3 (3d Cir.1995)(holding that the retaliation elements of an unlawful retaliation claim are generally issues for the trier-of-fact). Additionally, on the present record, the Court finds that genuine issues of material fact exist with regard to whether Defendants' conduct was in fact retaliatory.

### B. Whether Defendants' Conduct Rises To The Level Of A Constructive Discharge

▮▮▮▮ Constructive discharge occurs when an employer's unlawful retaliatory conduct is so intolerable that a reasonable person subject to such retaliation would feel compelled to resign. *Price v. Delaware Dep't of Correction*, 40 F.Supp.2d 544, 553 (D.Del.1999)(citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir.1996))(quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984)).

Plaintiff contends that Defendants' conduct created a work environment that would cause any reasonable person in his position to resign. Plaintiff contends that Defendants threatened him with termination if he did not revise his report and that Defendants held a secret meeting where Defendants contemplated replacing Plaintiff and conspired to retaliate against him. (D.I. 67 at 7). Plaintiff also contends that he had every reason to take Defendants' threats seriously because Defendants took action against Dominique Brown for reporting the unlawful conduct by forcing Brown to request a disability pension, in lieu of termination, for alleged psychiatric problems, despite years of commendable service as a correctional officer. (D.I. 1 at 6; D.I. 67 at 7).

Defendants contend that Plaintiff voluntarily resigned his position because of his unhappiness at work, which emanated from the criticism of his work and not because Defendants retaliated against the Plaintiff for the statements made in his report or expressions of a "cover-up." (D.I.69). Defendants contend that Plaintiff's unhappiness with his job at the Department of Corrections Internal Affairs Unit is evidenced from the fact that he was employed just three days after his resignation. (D.I. 45 at 13).

Plaintiff responds that there is no evidence to suggest that Defendants had criticized his work prior to his investigation and report on the inmate riot. (D.I. 67 at 7). Further, Plaintiff asserts that he followed the same format in drafting his investigative reports from the time he commenced his employment with the Department of Corrections Internal Affairs Unit and was not criticized. (D.I. 67 at 7).

On the present record, the Court finds that genuine issues of material fact exist with regard to the Plaintiff's Constructive Discharge Claim. For example, one factual dispute centers on whether Plaintiff resigned his position because he was unhappy with his position, or because Defendants' conduct created an atmosphere that caused Plaintiff to resign. These issues must be decided by a jury.

## IV. Conclusion

For the reasons discussed, the Court concludes that Plaintiff's speech in the context of the claims asserted by Plaintiff is protected by the First Amendment of the United States Constitution. Further, the Court finds that the concessions previously made by Defendants may be retracted and disputed issues of fact tried to a jury

commencing either December 17, 2001 or January 22, 2002.

An appropriate Order will be entered.

### ORDER

At Wilmington this 31 day of October, 2001, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that a trial on the issues of retaliation and constructive discharge will commence on either December 17, 2001 or January 22, 2002. The parties shall advise the Court of the date selected no later than November 2, 2001.

If the parties cannot agree, the Court will decide the trial date.